595 F.2d 441
 19 Fair Empl.Prac.Cas. 584, 19 Empl. Prac.
Dec. P 9104
Donald WREN, Appellant,
v.
T.I.M.E.-D.C., INC., Appellee.
 No. 78-1593.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 11, 1979.
Decided April 3, 1979.
 
 1
 Michael J. Hoare of Chackes & Hoare, St. Louis, Mo. (argued), and Michael Wolf of American Civil Liberties Union, St. Louis, Mo., on brief, for appellant.
 
 
 2
 Thomas E. Tueth of Lashly, Caruthers, Thies, Rava & Hamel, St. Louis, Mo. (argued), and Michael Miller of Gracey, Maddin, Cowan & Bird, Nashville, Tenn., on brief, for appellee.
 
 
 3
 Before ROSS and McMILLIAN, Circuit Judges, and VAN SICKLE, District Judge.*
 
 
 4
 VAN SICKLE, District Judge.
 
 
 5
 Donald Wren appeals from an order of the United States District Court for the Eastern District of Missouri dismissing his action against T.I.M.E.-D.C., Inc. Wren alleges that T.I.M.E.-D.C. discriminated against him because of his religious beliefs and practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e Et seq. The trial court, following the guidelines set forth by the Supreme Court in Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), concluded that T.I.M.E.-D.C. was unable to accommodate Wren's religious practices in a reasonable manner without undue hardship. We affirm.
 
 
 6
 Wren had been an employee of T.I.M.E.-D.C., an interstate trucking operation, since 1965. He was an over-the-road truck driver and had been a member of Local 600 of the Teamsters Union approximately nineteen years.
 
 
 7
 The St. Louis terminal operates 365 days a year and is a critical link in T.I.M.E.-D.C.'s trucking operation which covers basically the entire continental United States. At the time suit was brought, approximately sixty over-the-road truck drivers were employed at the St. Louis terminal.
 
 
 8
 The St. Louis terminal operates under a contract with Local 600 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. This agreement subjected the St. Louis terminal to a seniority system. This seniority system is important in scheduling drivers on the various runs. Approximately sixty percent of the over-the-road drivers' runs are bid runs. The remaining drivers are placed on the extra board.
 
 
 9
 Drivers, according to their seniority, may bid for set schedule runs during a bidding period that occurs once every six months. The bid run is desirable in that it consists of a schedule with a regular departure time, regular days off, a regular number of work hours per week, and a more steady paycheck.
 
 
 10
 Over-the-road drivers who are unable to secure a bid run because they lack seniority or are unwilling to secure a bid run for any personal reasons are placed on the extra board. Extra board drivers haul freight as it becomes available and must be available for call from the dispatcher twice daily. The extra board is also subject to the seniority system. Drivers on the extra board with the most seniority are called first and may reject the run only if extra board drivers with less seniority are available. If no extra board drivers with less seniority are available, the driver called is required to protect the shift by driving the run. Any driver on the extra board may decline a run for certain reasons. Some of these reasons are sickness of a driver, more than seventy hours of driving within eight days, or excused absence secured in advance of the dispatch. Thus, the least senior extra board driver contacted, who is without a sufficient excuse for not making the run, must make the run.
 
 
 11
 If all the extra board drivers are either assigned or have excused absences and there is still a need for drivers for the scheduled number of runs, the dispatcher checks with off-duty bid drivers, laid off city drivers, and casual road drivers[1] in that order. If either city drivers or casual road drivers are utilized, T.I.M.E.-D.C. is required under the union contract to make certain contributions to insurance and pension funds.[2] The substitute drivers do not have to be available for call from the dispatcher and, even if contacted, may refuse the run at will. This creates a problem in that if the dispatcher cannot locate a driver within a certain time period, a run may have to be cancelled. Since dispatches out of St. Louis are timed to relay with dispatches out of other T.I.M.E.-D.C. terminals, unavailability of a driver may result in delay or cancellation of both runs, causing T.I.M.E.-D.C. to experience a double economic loss and the customers to experience a delay in service.
 
 
 12
 Between 1974 and 1976, T.I.M.E.-D.C. was in serious financial difficulty. In an all-out effort to turn the company around, there were stringent measures taken. One of the measures taken was to reduce the number of drivers employed and to utilize the remaining drivers to their utmost capacity. Because certain benefits such as health, welfare, and pension costs are set, it is more economical to work one driver seventy hours per week than to work each of two drivers thirty-five hours per week.
 
 
 13
 At the time of this suit, Wren was 44-years old. In his thirteen years with T.I.M.E.-D.C., he had climbed to twenty-fourth out of fifty-nine drivers on the seniority list at the St. Louis terminal. In August of 1972, Wren began to study the beliefs of the Worldwide Church of God and was baptized into that faith in April of 1973. One of the principles of the religion is that the Sabbath, which is celebrated from sundown Friday to sundown Saturday, is a day of rest on which no work may be done. All parties agree that Mr. Wren's religious sincerity is not an issue in this case.
 
 
 14
 In April of 1973, Mr. Wren provided Tom Thiene, T.I.M.E.-D.C. Terminal Manager at St. Louis, with documents explaining the basic tenets of the Worldwide Church of God regarding its Sabbath and Holy Days. Since Wren's seniority was not high enough to secure a bid run that would not conflict with his Sabbath, he remained on the extra board. From 1973 through 1976, Wren was able to avoid work on most Sabbaths without incident. During this period of time, the company had a large pool of drivers, and the dispatchers would usually call Wren only when the extra board was exhausted. This same arrangement was apparently available to the other extra board drivers when they wanted time off. However, Wren was not immune from work on his Sabbath. Information compiled from his driver's log books indicate that Wren worked on all or part of his Sabbath twelve days in 1973, sixteen days in 1974, eleven days in 1975, and nine days in 1976.
 
 
 15
 On May 5, 1976, Robert Grempler became the St. Louis Terminal Manager. In an effort to cure the company's financial difficulties, Grempler reduced the number of drivers, and tried to utilize them to their maximum number of hours per week. Because of this reduction in drivers, the extra board became exhausted much more often than before, and Wren was asked to drive on his Sabbath with increased frequency. In June of 1976, Wren and another driver, who was a member of the Worldwide Church of God, asked for excused absences on their Sabbath. Grempler refused the requests with the following reply:
 
 
 16
 In reference to your request for excused absences, failure to protect your work shift when required in compliance with the National Master Freight Agreement and Central States Area Over the Road Supplemental Agreement, will result in disciplinary action, up to and including discharge.
 
 
 17
 In 1977, Wren began to insist that he would work on the Sabbath only in an emergency. Wren claimed an emergency existed only when less senior extra board drivers, off duty bid drivers, laid off city drivers, and casual drivers were all unavailable. But Grempler demanded that Wren be available to drive when the extra board was exhausted.
 
 
 18
 Wren then resorted to using his ingenuity to avoid working on the Sabbath. He scheduled dentist and chiropractor appointments on Saturdays. At other times he called in sick on Friday night. Wren also let his Department of Transportation Health Certificate (DOT) lapse. If all else failed, Wren could remember this certificate and have an excuse for not working on the Sabbath.
 
 
 19
 Because of these tactics, Wren was issued warning letters on June 25, 1977, July 5, 1977, and August 15, 1977. In these letters Wren was notified that Grempler would no longer accept any excuses from Wren for not protecting his dispatch on Friday nights and Saturday mornings with the exception of a claim of sickness verified by a doctor's statement.
 
 
 20
 On August 26, 1977, October 29, 1977, and December 12, 1977, Wren was discharged for failure to protect his dispatch. Each incident involved a refusal to accept a work assignment on the Sabbath. Wren was reinstated after the first two discharges upon his agreeing to be available for dispatch on his Sabbath when the extra board became exhausted. Wren never carried these agreements out.
 
 
 21
 The basic cause of Wren's discharge was his persistent attempts to observe his Sabbath. Title VII of the Civil Rights Act of 1964 prohibits the discharge of an employee because of his religion. Title 42 U.S.C. § 2000e-2(a)(1)-(2) provides:
 
 
 22
 (a) It shall be an unlawful employment practice for an employer
 
 
 23
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 
 
 24
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 
 
 25
 Religion is defined in 42 U.S.C. § 2000e(j) as follows:
 
 
 26
 (j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.
 
 
 27
 Thus, it is an unlawful employment practice for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of its employees.
 
 
 28
 The United States Supreme Court, in Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), provided new guidelines concerning the degree to which Title VII requires an employer to accommodate the religious beliefs of its employees. The Court stated, in an opinion by Mr. Justice White, that Title VII did not require an employer to undertake activity which would violate a bona fide seniority system in the name of accommodation. The Court also stated that an employer was not obligated to take accommodation steps which would require it to bear costs, such as overtime pay for replacements, if such costs were more than De minimis.
 
 
 29
 Having carefully scrutinized the record in this case and having found the facts to be as set forth above essentially the same as they were found by the trial court we apply the controlling law and reach the same conclusion as the district court. Judge Wangelin applied the Hardison standards to the facts of this case as follows:
 
 
 30
 It is true that defendant did not bend over backwards to accommodate plaintiff. However, it made efforts within the seniority system to aid him. Defendant is not required to go out of that system. TWA v. Hardison, 432 U.S. at 81, 97 S.Ct. 2264. Plaintiff even had one opportunity to bid on a regular run that did not conflict with his Sabbath. Although his failure to do so certainly does not preclude recovery, he does have an obligation to try to eliminate the conflict. (footnote omitted) Cf. Chrysler Corp. v. Mann, 561 F.2d 1282 (8th Cir. 1977).
 
 
 31
 The procedure plaintiff suggests would involve calling off-duty regular over-the-road drivers, laid off city drivers and casual drivers. In addition to paying extra contributions if casual or city drivers were used (as discussed earlier) dispatchers would be required to go through a more complicated procedure merely to find the driver. If that procedure were to fail, as it might because the alternate drivers suggested by plaintiff are not paid to be "on call", defendant would be required to cancel a run. The expenses could further pyramid if deliveries or customers were lost. Such a system would require T.I.M.E.-D.C. to bear more than a De minimis cost. TWA v. Hardison, 432 U.S. at 84, 97 S.Ct. 2264. Under the standards described in Hardison, defendant has fulfilled its obligation to plaintiff and judgment will be entered accordingly.
 
 
 32
 Wren v. T.I.M.E.-D.C., Inc., D.C., 453 F.Supp. 582, 584 (1978).
 
 
 33
 We hold that T.I.M.E.-D.C. should not be compelled to bear more than a De minimis cost in order to accommodate Wren's religious practices. Actual costs in using replacement drivers include contributions to insurance and pension funds and costs of locating replacement drivers. Additional costs are foreseeable because of delays and cancellations of runs when replacement drivers are not timely available. Further, it would violate the seniority system to arrange for Wren to have Saturdays off. It would deprive the other employees of their contractual seniority rights under the Central States Area Over the Road Supplemental Agreement.
 
 
 34
 We therefore affirm on the basis of the trial court's well reasoned opinion reported at 453 F.Supp. 582 (1978).
 
 
 
 *
 The Honorable Bruce M. Van Sickle, United States District Judge for the District of North Dakota, sitting by designation
 
 
 [1]
 Drivers who have no permanent employment relationship with the company
 
 
 [2]
 At the time this suit was brought, if a laid off city driver was used during a week, T.I.M.E.-D.C. was required to make the full weekly contribution into the Health and Welfare and Pension Funds provided under the terms of the union contract. This amounted to $55.50. If a casual driver was used, T.I.M.E.-D.C. was required to pay the casual driver an additional fifty cents per hour for a hospitalization insurance contribution, and to pay into the union's Pension Fund $6.00 per tour of duty