**Lehman BROWN, Appellant,**

v.

**GENERAL MOTORS CORPORATION, Appellee.**

No. 78–1834.

United States Court of Appeals, Eighth Circuit.

Submitted April 17, 1979.

Decided June 22, 1979.

Rehearing and Rehearing En Banc Denied Aug. 20, 1979.

William H. Pickett, Kansas City, Mo., argued and on brief for appellant.

John J. Yates (argued), Gage & Tucker, Kansas City, Mo. and Paul Scott Kelly, Jr., Kansas City, Mo., on brief for appellee.

Issie L. Jenkins, Acting Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, Lutz A. Prager and Paul E. Mirengoff, Attys., E.E.O.C., Washington, D.C., on brief for amicus curiae, E.E.O.C.

Before LAY, HEANEY and BRIGHT, Circuit Judges.

LAY, Circuit Judge.

Lehman Brown appeals from the judgment entered in an action brought against his former employer, General Motors, under Title VII of the Civil Rights Act of 1964 for religious discrimination in violation of Section 703(a)(1), 42 U.S.C. § 2000e–2(a)(1). Brown asserts that his discharge violated the Act's requirement that employers reasonably accommodate employee religious

beliefs.[1] The trial court, the Honorable Russell G. Clark, found that accommodation of Brown's religious belief would result in more than de minimus cost to his employer under the principles stated by the Supreme Court in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). Accordingly, the court entered judgment for defendant General Motors. On the basis of the record presented we respectfully disagree and reverse and remand the case to the district court for further proceedings.

Brown began work on General Motors' assembly line in Kansas City on March 26, 1964. His job entailed selecting the proper roof to be placed on a car body and assisting in its installation. In September 1966 Brown transferred to the daytime shift. Shortly after going on the first shift Brown joined the Worldwide Church of God. One of the tenets of this religion is that its members not engage in employment during the Sabbath, which is defined as the period from sunset on Friday until sunset on Saturday. While Brown was on the day shift his religious observance of the Sabbath did not interfere with his employment with General Motors. In March 1970 there was a workforce reduction on the assembly line due to economic conditions. Brown's seniority was such that he could no longer maintain his position on the first shift and in May 1970 he was transferred back to the second shift. This required him to work daily from approximately 4:00 P.M. until 12:30 A.M. From May 25 until August 19, when he was terminated for refusing to work scheduled plant hours, Brown failed to work after sunset on each Friday. He thereafter brought suit claiming his discharge by General Motors violated § 703(a)(1), 42 U.S.C. § 2000e-2(a)(1).

Section 703(a)(1), as recently interpreted by the Supreme Court in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), requires an employer to accommodate the religious observances of its employees unless such accommodation would contravene the provisions of a valid collective bargaining agreement or would cause the employer undue hardship. The only act of accommodation suggested by the parties is that Brown be allowed to leave work every Friday at sunset.[2] Since neither party contends that such an arrangement would contravene the collective bargaining agreement, the only remaining inquiry is whether the cost of the proposed accommodation would be more than de minimus. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. at 84, 97 S.Ct. 2264. In addressing this

---

1. The relevant portion of § 703 of the Act provides:

> (a) Employers. It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a)(1).

In 1972 Congress amended the Act in part by inserting the following language contained in § 701(j):

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).

Although the amendment was enacted after Brown's termination, an EEOC guideline containing substantively equivalent language was promulgated in 1967. Thus, the guideline has been accepted as a reasonable construction of the pre-1972 statute. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 76 n. 11, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

2. There is no question that General Motors did attempt to initially accommodate Brown by attempting to get the union to waive the provisions of the Shift Preference Agreement to allow Brown to be assigned back to the first shift out of the line with his seniority. The Union refused to waive the agreement. *Cf. Huston v. Local No. 93, International Union, UAW*, 559 F.2d 477 (8th Cir. 1977) (holding no violation of Title VII by the union in refusing to alter its seniority lists to accommodate a Sabbatarian). The result of the refusal of the union to so accommodate Brown was General Motors' utilizing their extra personnel to fill in for Brown during the closing hours of the Friday work day.

issue, the district court examined the effects of Brown's absence on Friday evening and made several findings of fact which are not disputed on appeal. Brown did not receive any pay for the time missed. A replacement worker filled in for him on the shift during the hours he missed. The district court found that General Motors employed "extra board men" who were at all times available to replace unscheduled absences of regular employees. The district court also found that "there were additional personnel in excess of the authorized work force in the body shop." Thus, the court found

> [s]ufficient numbers of substantially qualified workers were available without any additional cost in wages or overtime to the defendant to take over the plaintiff's job after sundown on Fridays between May 29 and August 19, 1970. . .

> . . . . .

> GM did not incur any additional costs in the form of overtime or wages due to the plaintiff's absence on Friday nights due to the "filling in" by the available personnel. The plaintiff was not paid for the hours not worked. Mr. Carr testified that plaintiff's absence was a "drop in the bucket" in terms of lost efficiency on the assembly line on each of the Friday nights that he was absent throughout the summer months.

Nonetheless the district court denied relief. First the court noted that "[t]here was testimony to the effect that . . . to guarantee that someone would be available with regularity would entail the hiring of an additional worker, the cost of which would be more than de minimus."[3] The court further concluded that

[a]lthough the effect of Brown's absence was like a "mere drop in the bucket" in terms of efficiency on any one night, the cumulative effect of numerous individuals who would desire to also be excused from their forty hour work week for various religious *and personal reasons* would create an "undue hardship" consistent with the test set forth in *Hardison.*

(Emphasis added.)

Finally the district court concluded that General Motors was not required to give Brown Friday evenings off because such an accommodation would actually result in preferential discrimination based on one individual's religious practices. .

We disagree with the court's reasoning and hold that the undisputed proof and finding of the trial court established that General Motors incurred no actual cost in accommodation of Brown's request before his actual discharge.

■ In order to establish a prima facie case of religious discrimination under §§ 2000e–2(a)(1) & (j), a plaintiff must plead and prove that (1) he has a bona fide belief that compliance with an employment requirement is contrary to his religious faith; (2) he informed his employer about the conflict;[4] and (3) he was discharged because of his refusal to comply with the employment requirement. *See Anderson v. General Dynamics Convair Aerospace Division,* 589 F.2d 397, 401 (9th Cir. 1978); *Burns v. Southern Pacific Transportation Co.,* 589 F.2d 403, 405 (9th Cir. 1978); *Redond v. GAF Corp.,* 574 F.2d 897, 901 (7th Cir. 1978). The facts found by the district court, which are not disputed by the parties, clearly establish a prima facie case of religious discrimination. The fundamental

(Emphasis added.)

---

**3.** The only testimony supporting this statement is by Mr. Carr, who at the time of Brown's discharge was General Motors' General Superintendent on the second shift, and reads:

> Q. Is it true, Mr. Carr, that in order to absolutely guarantee Mr. Brown every Friday night off you would have to hire another person and pay approximately $5.00·an hour for 40 hours?
> A. *Theoretically* that would have to happen, Yes, sir, in order to guarantee.

**4.** In *Chrysler Corp. v. Mann,* 561 F.2d 1282 (8th Cir. 1977), *cert. denied,* 434 U.S. 1039, 98 S.Ct. 778, 54 L.Ed.2d 788 (1978), this court stated that the employee claiming religious discrimination has the duty to acquaint the employer "with his religion and its potential impact upon his ability to perform his job." *Id.* at 1285.

question as posed by *Hardison*, therefore, is whether the proposed accommodation requires General Motors to bear an undue hardship in that more than de minimus costs would result therefrom. 432 U.S. at 74–75, 84, 97 S.Ct. 2264.

General Motors seeks to buttress the district court's conclusion that accommodating Brown would "theoretically" require General Motors to hire an additional full-time employee by citing evidence that there had previously been increased absenteeism on the second shift during 1970 on Fridays. General Motors argues that *before* Brown's situation arose absenteeism had been so high on Fridays that production had been halted in several departments on several different Fridays in order to provide employees with their 23 minute break periods; that during this time General Motors was forced to utilize every available employee.

This testimony fails to rebut the undisputed finding that Brown's absenteeism on the second shift at no time caused General Motors hardship. The general cumulative effect of prior plant problems, which evidently were solved before May 1970, or the projected "theoretical" future effects cannot outweigh the undisputed fact that no monetary costs and de minimus efficiency problems were actually incurred during the three month period in which Brown was accommodated.

As stated by the Sixth Circuit in *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975):

[w]e are somewhat skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that has never been put into practice. The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted.

*Accord, Burns v. Southern Pacific Transportation Co.*, 589 F.2d 403, 406–07 (9th Cir. 1978).

If an employer stands on weak ground when advancing hypothetical hardships in a factual vacuum, then surely his footing is even more precarious when the proposed accommodation has been tried and the postulated hardship did not arise.[5]

The second basis asserted by the district court in rejecting Brown's claim rests on the alleged cumulative effect that will arise when large numbers of employees want Friday nights off "for various religious and personal reasons."

Initially we note that § 2000e–2(a)(1) does not require an employer to reasonably accommodate the purely personal preferences of its employees. Accordingly, the costs which GM would bear resulting from accommodating Brown do not include excusing vast numbers of employees who wish to have Friday night off for secular reasons.

With regard to the possibility that numerous individuals sharing Brown's reli-

---

**5.** These facts clearly distinguish *Hardison* and this court's recent decision in *Wren v. T.I.M.E.–D.C., Inc.*, 595 F.2d 441 (8th Cir. 1979). In *Wren* the district court found that the employer would incur greater monetary costs in using replacement truck drivers. Furthermore, as this court stressed, "[a]dditional costs are *foreseeable* because of delays and cancellations of runs when replacement drivers are not timely available." *Wren v. T.I.M.E.–D.C., Inc.*, 595 F.2d at 445. (Emphasis added.) In *Wren*, as in this case, an "extra board" existed to ensure the completion of work—in that case the driving of trucks. Wren was a member of the extra board and sought to be excused from driving on Saturdays. The employer agreed to allow Wren to have Saturdays off so long as the extra board was not exhausted. Wren worked from approximately June until December

ber 1977 without working on Saturday. Thus in *Wren*, as in this case, the effect of the requested accommodation could be accurately observed based on several months experience. In *Wren*, however, it was clear that "the extra board became exhausted much more often than before" and therefore the employer had on several occasions been forced to use replacement drivers. Thus, the employment history of Wren during the "accommodation" period demonstrated that the requested accommodation would require the employer to bear greater than de minimus costs since "[a]ctual costs in using replacement drivers include contributions to insurance and pension funds and costs of locating replacement drivers." *Wren v. T.I.M. E.–D.C., Inc.*, 595 F.2d at 445. Accordingly, this court affirmed the district court's finding that no violation of § 703(a)(1) existed.

gious beliefs would desire to be excused and therefore place some actual burden constituting an undue hardship on GM,[6] the record reflects that only four other Sabbatarians were working on the second shift out of a total work force of 1200–1600. GM made no attempt to show whether accommodation of these employees would give rise to any costs or what the actual aggregated impact of accommodating these employees would be. Instead, GM seems content to speculate on the future impact of accommodating Brown. In its brief GM states:

> At least four other individuals were known at that time to the Corporation to be Sabbatarians who were on the second shift and were confronted with the same conflict between their religious beliefs and the requirements of their employment. *It is not unrealistic to presume* that there may have been others of similar beliefs who did not come forward or who were working on the first shift but who could have been affected by a further reduction in the work force. *See Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 85 n. 15, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). *Nor would it be inconceivable* that other employees might profess similar religious beliefs or requirements in order to receive the preferential treatment which Mr. Brown would have received had the Corporation accommodated him in the manner in which he asserts.

(Emphasis added.)

Such speculation is clearly not sufficient to discharge GM's burden of proving undue

hardship. *See Burns v. Southern Pacific Transportation Co.,* 589 F.2d 403, 407 (9th Cir. 1978); text accompanying note 5 *supra; see also The Supreme Court, 1976 Term,* 91 Harv.L.Rev. 70, 273 (1977).

We endorse the succinct phraseology authored by Judge Green in *Haring v. Blumenthal,* 471 F.Supp. 1172, No. 78–0085 (D.D.C. April 10, 1979) which reads:

> [I]t seems to this Court that "undue hardship" must mean present undue hardship, as distinguished from anticipated or multiplied hardship. Were the law otherwise, any accommodation, however slight, would rise to the level of an undue hardship because, if sufficiently magnified through predictions of the future behavior of the employee's co-workers, even the most minute accommodation could be calculated to reach that level.
>
> . . . Unless the statutory mandate [which requires reasonable accommodation] is to be rendered meaningless, it must be held to provide that until facts or circumstances arise from which it may be concluded that there can no longer be an accommodation without undue hardship, the employee's religious practices are required to be tolerated.

■ The district court's final concern was that accommodating Brown would in effect discriminate against all employees who did not adhere to Brown's religion. We cannot agree with this interpretation of *Hardison.* Such an application of *Hardison* would provide a per se proscription against any and all forms of differential treatment based on religion. The trial court relied on the following language contained in *Hardison* :

**6.** In support of its decision that speculation concerning employees who might hold religious beliefs similar to Brown's can be considered when calculating the cost of accommodation, the district court stated:

> [T]he Supreme Court in *Hardison* recognized that the de minimus cost analysis of accommodating one individual often "fails to take account of the likelihood that a company as large as TWA may have many employees whose religious observances, like Hardison's, prohibit them from working on Saturdays or Sundays." [*Trans World Airlines, Inc. v. Hardison,* 432 U.S. at 84 n. 15, 97 S.Ct. 2264.] Our examination of the factual predicate upon which footnote 15 is based reveals that the trial

court in *Hardison* found greater than de minimus cost associated with accommodating only Hardison. Thus, our reading of footnote 15 coincides with that expressed by Judge Winter's dissenting opinion in *Jordan v. North Carolina National Bank,* 565 F.2d 72, 78 (4th Cir. 1977):

> [I]f it is to be presumed as a matter of law that an employer may be required to do for one employee only what it may do for all employees "without undue hardship," no employer would ever be required to accommodate any religious belief of any employee. *But see id.* at 76.

The emphasis of both the language and the legislative history of the statute is on eliminating discrimination in employment; similarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin. This is true regardless of whether the discrimination is directed against majorities or minorities.

432 U.S. at 71–72, 97 S.Ct. at 2270.

Carried to its logical conclusion the court's application of the quoted language would preclude all forms of accommodation and defeat the very purpose behind § 2000e(j). *Hardison* itself recognizes that the Act affirmatively requires an employer "to make reasonable accommodation for the religious observances of its employees, short of incurring undue hardship. . . ." 432 U.S. at 75, 97 S.Ct. at 2272. Accordingly, finding that a proposed accommodation would entail some form of discrimination does not end the inquiry. The Court in *Hardison* held that differential treatment resulting from accommodation runs afoul of § 2000e–2(a)(1) if it: (1) would compromise other employees' contractual seniority rights as secured by a collective bargaining agreement; or (2) would confer a privilege, the cost of which was more than de minimus, solely on the basis of the recipient's religious beliefs. 432 U.S. at 81–85, 97 S.Ct. 2264. Neither of these situations is present in this case.

For the foregoing reasons, the judgment of the district court is reversed.