**Edwin A. RISING, Plaintiff**
**v.**
**ROADWAY EXPRESS, INC.**
**Defendant**

**No. 76-725-F**

United States District Court
Commonwealth of Massachusetts

**July 15, 1981**

**Stephen W. Silverman,** counsel for plaintiff
**Robert Garrett,** counsel for defendant

## OPINION

**FREEDMAN, D.J.** This case was tried by the Court, sitting without a

jury, on plaintiff's complaint that he was discharged from employment because of his religion, in violation of 42 U.S.C. sec. 2000e-2(a)(1). Jurisdiction is based upon 42 U.S.C. sec. 2000e-5(f)(3). The Court herewith enters its findings of fact and conclusions of law pursuant to F.R.Civ. P. 52(a).

## I. FINDINGS OF FACT
### A.

The defendant Roadway Express, Inc. (Roadway) is a large trucking company employing in excess of twenty-five persons, and engaged in an industry affecting interstate commerce. In furtherance of its business, Roadway operates a fleet of trucks and a network of cargo-handling terminals.

Edwin Rising was initially employed by Roadway at its Akron, Ohio facility as an over-the-road driver. While so employed, Rising began studying the religion known as the Worldwide Church of God. Rising resigned from Roadway on July 11, 1969 for personal reasons. In that same month, he was baptized into the Worldwide Church of God.

In January of 1971 Rising resumed his relationship with Roadway as a casual employee at Roadway's Enfield, Connecticut terminal. On April 11, 1971, and pursuant to the terms of the National Master Freight Agreement and the New England Supplemental Freight Agreement (hereinafter the Agreement), Rising became eligible for and was granted full-time employment by Roadway at the Enfield terminal See, Plaintiff's Exhibit 5.

The Worldwide Church of God observes the Sabbath from sunset Friday to sunset Saturday. Recreation and labor are proscribed during that period, and members devote themselves to prayer and study. Rising subscribed to these tenets, and regularly attended Worldwide Church of God Sabbath services at all relevant times.[1] Although Roadway operates on a six-day week, from Sunday evening to Saturday afternoon, Rising was largely able to avoid conflict with his Sabbath because he was assigned to shifts running from Sunday evening to Thursday evening. When Rising was working an extra, overtime shift (a "six punch") on Friday, he always sought to complete his work by sunset. On those few occasions when mechanical or other difficulties prevented him from stopping work by sunset, he did work into the Sabbath, but never worked a full shift on the Sabbath. He now regrets that he did any work at all on the Sabbath.

Rising does indicate that he had informed his supervisors at Enfield of his religious views. This is not corroborated by Roadway records, but the lack of corroboration is not critical in view of the fact that no religious/work conflicts arose in Enfield.

In early 1972 Roadway determined that traffic out of Springfield, Massachusetts was sufficient to support a separate terminal — Springfield previously having been serviced out of Enfield. Employees were offered the opportunity to bid, based on seniority, for assignment to either the Enfield or the new Springfield terminal. Rising bid for Springfield, and reported to the new terminal on or about February 14, 1972. It is clear that, prior to his transfer, Rising had notified the Springfield manager-designate, M. P. Lloyd, of his religious practices. Defendant's Exhibit E.

The initial bid list for the new terminal contained no Sunday through Thursday shifts. Defendant's Exhibit B. Rising, who was eighteenth in

---

[1] The Worldwide Church of God also observes a number of holydays during the year. These holydays were not at issue in his discharge.

seniority out of nineteen men at Springfield, was relegated to the 11:00 p.m. Monday through Friday shift.[2] **Id.** Working this shift from 11:00 p.m. Friday to 8:00 a.m. Saturday would inevitably conflict with the Worldwide Church of God Sabbath, and records indicate that he resolved this conflict by missing work on Fridays. See, Plaintiff's Exhibit 3.[3]

A new bid list was posted on March 19, 1972 which included four shifts that could have accommodated Rising's religious beliefs. All four were taken by more senior men, and Rising was compelled to take the 7:00 p.m. Monday through Friday shift. As with his initial Springfield shift, this new shift inevitably conflicted with the Worldwide Church of God Sabbath. Roadway records continue to reflect regular Friday absences. Plaintiff's Exhibit 3.

On April 5, 1972 Rising was issued a warning for missing seven consecutive Fridays as well as one Tuesday (the only Worldwide Church of God holyday at issue, for which he called in sick).[4] Plaintiff's Exhibit 2. Current Roadway policy would call for a warning after missing two days in any four-week period. See, Testimony of Richard Hoss. While there was apparently no formal policy at the time, Rising's absences were considered excessive.

On May 15, 1972, Rising received a second warning for missing six additional Fridays. Plaintiff's Exhibit 2. On May 22, 1972 he was suspended for one day, having missed another Friday. **Id.** This was followed by a three-day suspension on May 27, and a five-day suspension on June 3, both for missing succeeding Fridays. On June 17, 1972 Rising was discharged. **Id.**

Teamsters Local 404 filed a grievance on Rising's behalf, for determination by the New England Joint Area Committee, an arbitration body constituted by contract and composed of labor and employer representatives. Plaintiff's Exhibit 6. The Committee ordered that Rising be reinstated, but without back pay and with the understanding that further absence would result in discharge. **Id.** Rising was reinstated, missed the next Friday shift, and was immediately discharged on June 30, 1972.

Rising filed charges soon afterwards with the Equal Employment Opportunity Commission (EEOC), and with the Massachusetts Commission Against Discrimination (MCAD). No resolution was forthcoming, and the EEOC issued a 90-day "Notice of Right to Sue" letter on December 17, 1975. This action followed on February 24, 1976.

A subsequent bid list, posted on October 11, 1972—well after Rising's discharge—contained a number of shifts that could have accommodated Rising's religious beliefs. Defendant's

---

[2] Under this seniority system, only one person was junior to Rising. This meant that, pursuant to the National Master Freight Agreement, the seventeen more senior men had first choice at available shifts.

[3] It was Rising's recollection that upon his transfer to Springfield, he was initially working the same Sunday through Thursday shift that he worked at Enfield. This recollection is not borne out by the "Employees' Pay and Work Report," however. Plaintiff's Exhibit 3. As of the week of February 14, 1972, Rising was marked U/E (for "unexcused absence") on Fridays. This exhibit corroborates the initial bid list for Springfield, Defendant's Exhibit B, and suggests that Rising was indeed on a Monday through Friday shift. The testimony of Robert Wickham, manager of the former Hartford (Enfield) - Springfield terminal prior to the establishment of the Springfield terminal, likewise establishes that the original plan for staffing the new terminal did not envision any Sunday through Thursday shifts that could have accommodated Rising's religious beliefs. See also, Testimony of Richard Hoss.

[4] In light of the large number of Sabbaths that Rising missed work on, his absence on one holy-day had, at most, a cumulative impact on his discharge.

Exhibit C. As was the case on prior bid lists, however, all such shifts were taken by men with greater seniority than Rising. **Id**; Plaintiff's Exhibit 1.

**B.**

Rising initially responded to the Sabbath conflict by not reporting for his shift on Fridays, and instead reporting on Sundays for available work.[5] Roadway objected to this conduct for several reasons.

There was no question that, despite working forty hours a week, Rising was nevertheless displaying a pattern of absenteeism with respect to his usual shift. Roadway felt that this created a serious discipline problem, for if it were to tolerate Rising's absenteeism, it would be unable to take any action against other employees who were absent excessively. This concern was confirmed by the testimony of John Murphy of the Teamsters Union, who indicated that the Union would, in fact, object to discipline of anyone else for absenteeism if Rising was allowed to miss his Friday shift on a regular basis.

Another Roadway objection centered on the financial consequences of Rising's course of conduct. Under the terms of the Agreement, any work performed on a Sunday, when Sunday is not the first day of the employee's workweek, must be compensated at the overtime rate of time and one-half. Agreement, Art. 49(d). Because Rising was assigned to Monday through Friday shifts in Springfield, his work on Sunday was considered overtime even though he regularly missed Fridays. As a result, Rising received five and one-half days' pay for working only five days.

Rising's unilateral decision to report Sundays instead of Fridays, which created problems in his relationship with Roadway, also posed larger problems for Roadway in fulfilling its obligations under the Agreement, which contains a specific prohibition of private agreements between employers and employees which would conflict with other provisions set out therein. Agreement, Art. 44, sec. 2. By acquiescing to Rising working Monday through Thursday plus Sunday, Roadway would be creating a **de facto** Sunday through Thursday shift. However, the Agreement provides that:

> Employees in the order of their seniority shall have the right to select their reporting times and assignments from the schedule, and to hold such assignments unless displaced by a change in schedule or by layoff for lack of work.

Agreement, Art. 43, secs. 1(d)(1), 1(f). As previously noted, Rising never had the seniority to bid on such a shift. Consequently, allowing Rising to work these hours would constitute a breach of the Agreement. See, Testimony of John Murphy, Teamsters Union.

In an effort to resolve this aspect of the conflict between Rising and Roadway, Teamsters Local 404 was brought into the discussion. The Local would not agree to waive seniority, but it did agree to attempt to arrange a shift swap between Rising and another more senior employee who currently held a shift that would not conflict with Rising's Sabbath. Roadway was amenable to such a swap if arranged by Local 404, because it would provide the necessary work coverage and avoid conflict with the terms of the Agreement. However, for various reasons no other employee was willing to swap shifts with Rising. This inability to arrange a swap, coupled

---

[5] Sunday was a peak traffic day, which required Roadway to engage extra help. However, the average workload over a five-day workweek commencing Sunday was inadequate to warrant creation of a full shift. Consequently, Roadway offered overtime to regular employees or brought in casual employees for Sunday.

with the Union's refusal to waive seniority, or any other provisions of the Agreement, precluded any arrangement for Rising that would not conflict with the Agreement.

### C.

Rising suggests two options that Roadway could have adopted to accommodate his religious needs. The first option would have involved allowing Rising to work Monday through Thursday at regular pay, and Sunday at regular pay if work was available. The second option would have involved creation of additional formal Sunday through Thursday shifts for which Rising could successfully bid.[6]

The first option creates a plethora of conflicts with the Agreement, including the requirement that the workweek consists of five days (Art. 53, sec. 1) and that the employee be guaranteed a minimum of eight hours of pay for each day (Art. 53, sec. 3(a) ). Moreover, work on Sunday, if Sunday is not the first day of a shift, must be compensated at the overtime rate. Agreement, Art. 49(d).[7]

The second option, creating additional shifts, has previously been discussed in some detail. Due to Rising's lack of seniority and the popularity of Sunday through Thursday shifts, there is no indication that Rising could have successfully bid for such a shift unless the entire Springfield schedule was rearranged.

## II CONCLUSIONS OF LAW
### A.

Title VII of the Civil Rights Act of 1964 provides in relevant part that "(i)t shall be an unlawful employment practice for an employer—(1) to . . . discharge any individual . . . because of such individual's . . . religion . . .'' Section 703(a)(1), 42 U.S.C. sec. 2000e-2(a)(1). Congress has gone on to define the term "religion'' as'

(A)ll aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. sec. 2000e(j); see also, 29 C.F.R. sec. 1605.1.

Rising bears the initial burden under Title VII of establishing a **prima facie** case of wrongful discharge because of his religion. **McDonnell Douglas Corp. v. Green,** 411 U.S. 792, 802 (1973). I am satisfied, on the basis of evidence adduced at trial, that the Worldwide Church of God is a bona fide religion within the meaning of sec. 2000e(j), and that Rising is a member of that religion and an adherent of its tenets.

---

[6] In addition, Roadway has addressed two other alternatives. There was some testimony as to the possibility of allowing Rising to transfer back to Enfield under the return provisions of the Agreement. Art. 43, § 2(a)(2). However, it appears that Springfield was a new division in an area where there are existing operations, a situation which does not carry return privileges. Art. 43, § 2(a)(1).

Roadway also mentions the possibility of allowing Rising to work only until sunset on Fridays. This conflicts with the requirement that each employee be guaranteed eight hours of work (and pay) per day, and would require that any substitute brought in to finish Rising's shift likewise be guaranteed eight hours of pay. Agreement, Art. 53.

[7] Roadway also notes that it would still have to have someone on Friday's to fill Rising's slot, either by offering overtime to a regular employee or by hiring a casual employee (which would require payment of extra benefits). Rising objected to this testimony on the grounds that no such expenses were mentioned in Roadway's Answer to Interrogatories. I find that the copy of the Agreement appended to Roadway's Further Answers to Interrogatories docketed on October 17, 1977 adequately addresses this point, and the objection is overruled.

At least as of the time he transferred to Springfield, Rising had notified Roadway of his beliefs and the potential conflict between his beliefs and the shifts available in Springfield. Rising consistently missed his assigned shift on Fridays because he observed the Sabbath, and he was discharged because of his consistent absenteeism. I am therefore satisfied that Rising has made out a **prima facie** case. See, **Brown v. General Motors Corp.**, 601 F.2d 956 (8th Cir. 1979); **Burns v. Southern Pacific Transportation Co.**, 589 F.2d 403 (9th Cir. 1978), **cert. denied,** 439 U.S. 1072 (1979).

### B.

Where an employee has made out a **prima facie** case of religion-based discrimination against his employer, the burden then shifts to the employer to demonstrate that "he is unable to reasonably accommodate to (the) employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."[8] 42 U.S.C. sec. 2000e(j).

I note first that Roadway did make reasonable efforts to accommodate Rising, despite his consistent absenteeism. Rising did not even receive a warning until he had missed eight days of work for religious reasons in a two and one-half month period.[9]

He was allowed to miss ten additional Fridays before he was discharged, and even then given another chance in accordance with the decision of the New England Joint Area Committee. Thus, Roadway's actions were far from precipitous, and in fact allowed all parties ample time to explore alternatives.

Of those alternatives, the most satisfactory would have been a Union-arranged shift swap. Both Roadway and Local 404 would have been satisfied with this course, and such a swap clearly would have constituted a reasonable accommodation to Rising's needs. However, the swap proposal fell through when no other employee would agree to participate. Could it have been arranged, the swap would not have worked any undue hardship upon Roadway.

The failure to arrange a swap, and Rising's resulting discharge, in turn, require consideration of whether there were any other reasonable alternatives that could have accommodated Rising without causing undue hardship to Roadway. In this context, I must first note that Roadway did not make an effort to implement any alternatives, beyond its acquiescence to any shift change that could be arranged by Local 404 and its deferral of dismissal to allow exploration of swap option. There is an apparent split of authority as to how much effort an employer must make in order to satisfy 42 U.S.C. sec. 2000e(j). See, **Edwards v. School Board of City of Norton, Virginia,** 483 F.Supp. 620, 625 (W.D. VA 1980). I am nevertheless satisfied that Roadway's active efforts on

---

[8] It is not immediately apparent how the burden of "demonstrating" inability to accommodate an employee is to be reconciled with the Supreme Court's position that in a Title VII case an employer need only articulate "some legitimate nondiscriminatory reason (for its action)" in order to rebut the prima facie case. **McDonnell Douglas Corp. v. Green,** 411 U.S. 792, 802 (1973). It seems well-established that the burden of "articulation" is in fact a burden of production, rather than the more stringent burden of proof. **Texas Department of Social Services v. Burdine,** 49 U.S.L.W. 4214, 4216 (March 4, 1981). On the facts of this case, however, I need not attempt to resolve the variance of standards. Roadway has introduced credible evidence of its efforts to accommodate Rising, leaving as the only issues for determination the question of whether those efforts were reasonable, or whether they would impose an undue hardship. See, **Texas Department of Social Services, supra,** 4217.

[9] One of these days was a Worldwide Church of God holyday, on which Rising called in sick. I do not consider Rising's absence on this day to be a significant factor in Roadway's decision to discharge him.

Rising's behalf were adequate, in that they closely parallel the efforts of the employer upheld in **Trans World Airlines, Inc. v. Hardison,** 432 U.S. 63, 66-70, 79 (1977).

Upon due consideration of the evidence I am persuaded that, of the proposed scheduling schemes that could have accommodated Rising, none could have been reasonably implemented without causing Roadway undue hardship. As previously noted, Rising has suggested two alternatives, although they amount to essentially the same scheme. The first would create a split shift, Monday through Friday, plus Sunday, all at regular pay. The second would require Roadway to create as many additional Sunday through Thursday shifts as would be required to allow Rising to successfully bid for one. In either case, the net effect would be to secure a Sunday through Thursday shift for Rising.

The four-day week alternative, with available Sunday work at regular pay, poses an immediate conflict with the Agreement. It violates the requirement of a guaranteed five-day workweek, and it violates the requirement that any work on Sunday (unless that is the employee's regular starting time) be compensated at the overtime rate. Agreement, Art. 49(d). In the face of Union refusal to tolerate variance from Agreement terms, Roadway properly refrained from attempting to institute a four-day week for Rising. As the Supreme Court noted in **Trans World Airlines,** although a collective-bargaining contract could not be employed to circumvent 42 U.S.C. secs. 2000e-2(a)(1) or 2000e(j), "the duty to accommodate (does not require the employer) to take steps inconsistent with the otherwise valid agreement." **Trans World Airlines, Inc. v. Hardison, supra,** 79. There has been no suggestion here that the Agreement was in any way faulty.

The four-day week alternative, plus available Sunday work at regular pay, also creates a **de facto** Sunday through Thursday shift, which would be awarded to Rising without giving more senior employees an opportunity to bid for it. By violating the bidding terms of the Agreement, this course impinges upon the well-established seniority system, which "itself represent(s) a significant accommodation to the needs, both religious and secular, of all ... employees." **Trans World Airlines, Inc., supra,** 78. "The seniority system represents a neutral way of minimizing the number of occasions when an employee must work on a day that he would prefer to have off." **Id.**

It would likewise be unreasonable to compel Roadway to institute enough formal non-conflicting shifts, **i.e.,** Sunday through Thursday, so as to allow Rising to successfully bid for one. In light of his low seniority in Springfield, and the desirability of shifts commencing on Sundays (as reflected in the October bid list), such an accommodation for Rising would require Roadway to restructure its entire workweek, either curtailing Friday-Saturday operations altogether, or conducting operation by using employees on overtime (or casuals). Both courses carry more than a **de minimis** cost, and thereby amount to an undue hardship to Roadway. **Id.,** 84.

### Conclusion

Although Rising clearly was discharged because his religious practices conflicted with Roadway's work schedule, I have determined that there was no reasonable manner by which those practices could have been accommodated, without working an undue hardship on Roadway. Consequently, I must conclude that Rising has failed to establish a violation of Title VII, 42 U.S.C. secs.

2000e-2(a)(1) and 2000e(j).

Judgment shall enter for the defendant.

**Frank H. Freedman**
**United States District Judge**