KA NAM KUAN, Plaintiff,

v.

CITY OF CHICAGO, Richard J. Brzeczek, Charles H. Pounian, Defendants.

No. 82 C 4264.

United States District Court,
N.D. Illinois, E.D.

May 13, 1983.

Robert M. Hodge, Chicago, Ill., for plaintiff.

Stanley Garber, Corp. Counsel, John M. O'Malley, Asst. Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

Plaintiff is a Chicago police officer of Chinese national origin. He has filed this action challenging certain employment practices of the City of Chicago under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17 (1976), and as violative of the due process clause of the fourteenth amendment to the Constitution and hence 42 U.S.C. § 1983 (Supp.IV 1980). Also named as defendants are the superintendent of police and the city's director of personnel. Defendants have moved to dismiss the complaint.

Count I of the complaint is brought under Title VII. Plaintiff contends that from 1976 to 1978 he received low performance ratings from his superiors which in effect doomed his chances to be promoted to sergeant. Plaintiff learned of his low performance ratings in September of 1978. However, he did not file a complaint with the Equal Employment Opportunity Commission until April 10, 1980. Under Title VII, an administrative complaint must be filed within 300 days of the challenged discriminatory act. *See* 42 U.S.C. § 2000e–5(e) (1976). Plaintiff contends that the discriminatory act at issue is the use of the ratings as part of the 1979 sergeants' exam, which did not occur until November, 1979, rather than the ratings themselves. However, the Supreme Court has held that the statutory time period begins to run on the date plaintiff learns of the actual discrimination, and not on the date that its consequences become painful. *See Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). There, it was held that the date on which the plaintiff had learned that his tenure would be denied, rather than the date he was discharged, began the running of the statute, since it was the denial of the tenure that was the challenged act. *See Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 30, 70 L.Ed.2d 6 (1981) (per curiam). Here, the allegedly illegal acts at

issue are plaintiffs' performance ratings. It is the ratings themselves that are alleged to be discriminatory; no allegation is made that they were not applied to the exam in an evenhanded fashion in November, 1979. Thus, by September, 1978, the challenged act was complete. The use of the low ratings in November, 1979, was only the point at which the consequences of the low ratings became painful. By September, plaintiff knew everything he needed to know to file a Title VII action but did not do so. As a result, his Title VII action is time-barred.[1]

Count II is brought under § 1983 and alleges that defendants' use of performance ratings violates due process. The parties agree that the constitutional standard applicable to this claim is that set out in *DiIulio v. Board of Fire and Police Commissioners,* 682 F.2d 666 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982).

> While the state can require high standards of qualifications, these standards must have a rational connection with the applicant's fitness or capacity to be a police sergeant. Attaching unreasonable and arbitrary requirements is violative of constitutional due process.

*Id.* at 668–69 (citation omitted).

 Plaintiff's complaint clearly states a claim under *DiIulio.* It alleges that his performance ratings were arbitrary and

that performance ratings cannot rationally be used to predict performance as a sergeant. First Amended Complaint ¶¶ 2–3 to 2–4. Defendants do not contest the sufficiency of plaintiff's pleading but rely instead on this court's finding that performance ratings could be used as a basis for promotion to sergeant in *United States v. City of Chicago,* 411 F.Supp. 218, 238–39, 241 (N.D.Ill.1976), *aff'd in part and rev'd in part,* 549 F.2d 415 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). However, since that contention goes outside the pleadings it is premature. If defendants wish to pursue this argument they should move for summary judgment.[2]

Count III is brought under Title VII. Taking its allegations as true, the facts are as follows. The City of Chicago grants 12 paid holidays per year to its police officers, regardless of their religion. It also grants certain paid holidays to employees who are members of certain "minority" religions such as Judaism, Greek Orthodox and Muslim. Plaintiff, who is Protestant, receives fewer paid holidays than do members of these religions and is forced to work certain overtime and otherwise undesirable assignments. As a result, defendants have imposed an undue burden on plaintiff, it is alleged, and have discriminated against him on the basis of his religion in violation of Title VII.

Title VII provides,

---

1. Plaintiff claims the statutory period never began because he has alleged a "continuing violation." That argument was also rejected in *Ricks,* which held that there is no continuing violation where only a single discriminatory act is alleged. In such a case, the violation does not continue, only its effects do. Here, the violation was complete when plaintiff was evaluated. Plaintiff also argues that he did not know that the ratings would be used to determine promotions, since this court's decree in *United States v. City of Chicago,* No. 73 C 2080, had forbidden use of performance evaluations. That is not the case. After a full trial, we specifically held that the city could use performance evaluations in making promotions to sergeant. *See United States v. City of Chicago,* 411 F.Supp. 218, 238–39, 241 (N.D.Ill. 1976), *aff'd in part and rev'd in part,* 549 F.2d 415 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). Plaintiff must have known that his low performance ratings

were important, since he grieved them in 1978. Since plaintiff knew his ratings were low then, he should have filed an action then. *Cf. Yates v. Mobile C'nty Personnel Bd.,* 658 F.2d 298 (5th Cir.1981) (statutory period begins on date plaintiff learned his test score was too low for promotion).

2. Defendants are correct, however, that if plaintiff seeks to attack not the overall policy of using performance ratings, but rather the particular ratings he received, he must sue Sgts. Nelson and Vetch, who gave him the allegedly arbitrary ratings, and not these defendants. These defendants cannot be liable for the ratings given by Sgts. Nelson and Vetch unless the ratings were made pursuant to a custom, policy or practice of the police department. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 690–95, 98 S.Ct. 2018, 2035–38, 56 L.Ed.2d 611 (1978).

It shall be an unlawful employment practice for an employer—

(1) ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion ....

42 U.S.C. § 2000e–2(a)(1) (1976). The statute goes on to provide,

The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's religious observance or practice without undue hardship on the conduct of the employer's business.

*Id.* § 2000e(j).

The leading case in this area is *Trans World Airlines v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). Hardison's religious beliefs prevented him from working from sundown Friday until sundown Saturday, which was part of his assigned shift. The Court held that the employer, TWA, could not reasonably accommodate Hardison's religious beliefs and that as a result his discharge for failure to work his assigned shifts was not religious discrimination within the meaning of the statute.

To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship.... *[T]o require TWA to bear additional costs when no such costs are incurred to give other employees the days off that they want would involve unequal treatment of employees on the basis of their religion.* By suggesting that TWA should incur certain costs in order to give Hardison Saturdays off the Court of Appeals would in effect require TWA to finance an additional Saturday off and then to choose the employee who will enjoy it on the basis of his religious beliefs. While incurring extra costs to secure a replacement for Hardison might remove the necessity of compelling another employee to work involuntarily in Hardison's place, it would not change the fact that the privilege of having Saturdays off would be allocated according to religious beliefs.

As we have seen, the paramount concern of Congress in enacting Title VII was the elimination of discrimination in employment. In the absence of clear statutory language or legislative history to the contrary, *we will not readily construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath.*

*Hardison,* 432 U.S. at 84–85, 97 S.Ct. at 2277 (emphasis supplied) (footnote omitted).

 The rationale of *Hardison* is that when an employer bears more than a de minimis cost to accommodate a religious belief, it in effect discriminates against its other employees on the basis of their religious beliefs. A number of courts have read *Hardison* exactly that way. *See Brener v. Diagnostic Center Hospital,* 671 F.2d 141, 146 (5th Cir.1982); *Tooley v. Martin-Marietta Corp.,* 648 F.2d 1239, 1243 (9th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981); *Nottelson v. Smith Steel Workers D.A.L.U. 19806,* 643 F.2d 445, 451 (7th Cir.1981); *Brown v. General Motors Corp.,* 601 F.2d 956, 961–62 (8th Cir.1979); *Burns v. Southern Pacific Transportation Co.,* 589 F.2d 403, 406 (9th Cir. 1978), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979). The logical implication is that where plaintiff does allege that his employer's accommodation involves more than a de minimis cost, that accommodation amounts to religious discrimination within the meaning of Title VII. That is plaintiff's legal theory here, in what appears to be the first "reverse religious discrimination" case reported under Title VII.

Defendants do not quarrel with the soundness of plaintiff's legal theory, but argue only that the costs created by their policy are de minimis. However, defendants have not submitted affidavits or other evidentiary materials detailing the costs arising from their policy, so this defense must await fuller development of the record. The complaint does allege that defendants' policy requires officers such as

plaintiff to work overtime on a regular basis; that is exactly the sort of burden that was held to be undue in *Hardison. See also Brener v. Diagnostic Center Hospital,* 671 F.2d 141, 146 (5th Cir.1982).[3] Ultimately, the question whether defendants have imposed an undue burden on employees such as plaintiff, or whether the burden is de minimis, is a question of fact that will depend on a variety of factors, as the applicable regulation indicates.

> The Commission will determine what constitutes "more than a *de minimis* cost" [*Hardison*, 432 U.S. at 84, 97 S.Ct. at 2277] with due regard given to the identifiable cost in relation to the size and operating cost of the employer, and the number of individuals who will in fact need a particular accommodation. In general, the Commission interprets this phrase as it was used in the *Hardison* decision to mean that costs similar to the regular payment of premium wages of substitutes, which was at issue in *Hardison,* would constitute undue hardship. However, the Commission will presume that the infrequent payment of premium wages for a substitute or the payment of premium wages while a more permanent accommodation is being sought are costs which an employer can be required to bear as a means of providing a reasonable accommodation. Further, the Commission will presume that generally, the payment of administrative costs necessary for providing the accommodation will not constitute more than a *de minimis* cost. Administrative costs, for example, include those costs involved in rearranging schedules and recording substitutions for payroll purposes.

29 C.F.R. § 1605.3(e)(1) (1982).[4]

[7] It may well be that after all the relevant circumstances are examined it will be clear that the challenged accommodation involves de minimis costs. However, at this stage, we do not know the number of employees accommodated, the magnitude of the overtime the city must pay, or the extent of the impact of the policy on the city's budget and the work schedules of the police officers who are not accommodated. Moreover, plaintiff has alleged that the city must pay premium wages to substitutes on a regular basis which is the type of burden that was held to be undue in *Hardison.*[5] Thus, we cannot say that it appears beyond doubt that plaintiff can prove no set of facts which would entitle him to relief; hence count III should not be dismissed. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

Defendants' motion to dismiss is granted with respect to count I of the first amended complaint, and denied with respect to counts II and III. Defendants to answer counts II and III within 14 days. For purposes of trial on count II, this case is consolidated with *United States v. City of Chicago,* No. 73 C 2080. Trial, etc. on count III will occur immediately after the trial of the sergeant issues in 73 C 2080.

---

**3.** *Brown v. General Motors Corp.,* 601 F.2d 956, 960 (8th Cir.1979), on which defendants principally rely, is distinguishable since there the employer could accommodate the religious belief in question without incurring any monetary costs. "[N]o monetary costs and de minimis efficiency problems were actually incurred during the three month period in which Brown was accommodated." *Id.* Here, plaintiff has alleged monetary costs: the accommodated employees receive paid vacations and other employees must work overtime, presumably at premium wage rates.

**4.** The regulation is entitled to "great deference." *Griggs v. Duke Power Co.,* 401 U.S. 424, 434, 91 S.Ct. 849, 855, 28 L.Ed.2d 158 (1971).

**5.** Defendants do not argue that their accommodation was part of an affirmative action program designed to get previously under-represented religious minorities into the work force. If they did, this might be a different case. *Cf. United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (affirmative action for racial minorities). Absent such an argument, Title VII prohibits racial discrimination for as well as against religious minorities. *Hardison,* 432 U.S. at 71–72, 81, 97 S.Ct. at 2270–71, 75.