**Linda MURPHY, Plaintiff,**

v.

**EDGE MEMORIAL HOSPITAL and Edra Dunn, Director of Nursing, Defendants.**

Civ. A. No. 82–173–N.

United States District Court, M.D. Alabama, N.D.

Nov. 9, 1982.

John L. Carroll, Montgomery, Ala., for plaintiff.

Bruce J. Downey, III, Capell, Howard, Knabe & Cobbs, Montgomery, Ala., for defendants.

### OPINION

MYRON H. THOMPSON, District Judge.

The plaintiff Linda Murphy, a Licensed Practical Nurse (LPN), brought this action against the defendants Edge Memorial Hospital and Edra Dunn, former Director of Nursing at the hospital, claiming that the defendants discharged her from employment at the hospital on account of her religious practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e(j), 2000e–2(a)(1). The case was tried before the court without a jury on August 25, 1982.

Based on the following findings of fact and conclusions of law, the court is of the opinion that judgment is due to be entered in favor of the defendants.

### I.

Linda Murphy is a follower of the Worldwide Church of God, a Christian sect which adheres to a number of religious practices found in the Old and New Testaments. One of the church's practices is the strict observance of a Sabbath from sundown Friday until sundown Saturday. *See, e.g., Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 67, 97 S.Ct. 2264, 2268, 53 L.Ed.2d 113 (1977). Church followers must refrain from performing any work on the Sabbath and on several other religious days during the year. During the relevant period of this lawsuit Murphy was studying and preparing to become a member of the church. She testified that to this end she attempted to follow all of the church's practices, which in addition to Sabbath observance, included attending services, studying religious material distributed by the church, listening to the church's radio broadcasts, and following certain dietary restrictions. She testified, however, that there was an exception to the practice of not working on the Sabbath. According to her understanding, church followers could perform work on the Sabbath when the work was required by an emergency or urgent situation, which could not be put off until later. She referred to such an emergency situation as "an ox in the ditch." *See Luke* 14:1–5 ("... Which of you shall have an ass or an ox fallen into a pit, and will not straightway pull him out on the sabbath day?"). She testified, however, that working on the Sabbath when it was not such an emergency made her feel distressed and guilty.

In September 1978, Murphy applied for a job as an LPN at Edge Memorial Hospital in Troy, Alabama. During her initial interviews with both Edra Dunn, then Director of Nursing, and Ruth Griffin, Nurse Supervisor of the 11:00 p.m. to 7:00 a.m. shift, Murphy explained that her religious practices prevented her from working Friday evenings and Saturdays until sundown. Griffin, who as shift supervisor scheduled the nurses and LPN's on the 11–7 shift, stated that she would attempt to accommodate Murphy's religious practices by scheduling her to be off each Friday shift, which began at 11:00 p.m. Friday night and ended at 7:00 a.m. Saturday morning. Griffin stated, however, that the hospital could not promise Murphy that she would be off every Saturday.

From November 6, 1978, until March 23, 1979, the hospital was able to accommodate Murphy's religious practices by scheduling her off on every Friday night. During this period of accommodation, however, Griffin received an increasing number of complaints from nurses and other LPN's that Murphy was enjoying unjustified consideration, or that the hospital was showing favoritism towards Murphy. Some of these complaints concerned Murphy's not working her "fair share" of Friday nights, others concerned allegations that Murphy's "free" Friday nights put an extra burden on the nurses who had to be scheduled on weekends. In addition, some staff members complained that they would like to have every Saturday night off, because their Sabbath was Sunday. The defendants presented strong testimony that weekends were highly valued as free time by the nursing staff, and that employees avoided weekend work whenever possible. There was no evidence, however, that any of the other nurses or LPN's had religious practices which required strict observance of the Sabbath, as Murphy's did.

In response to the complaints, Griffin scheduled Murphy to work on Friday, March 30, 1979. Murphy reported to work that Friday night because she understood the shift to be an exceptional situation in which no one else could be found. In Murphy's words, "the ox was in the ditch." Beginning with the next four-week schedule, Griffin scheduled Murphy to work on certain Friday night shifts, yet continued to give some consideration to Murphy's religious observance. The next Friday night on which Murphy was scheduled, however, she called in sick. Afterwards, Griffin discussed the incident with Murphy, and told her that because of the complaints Griffin would have to continue to schedule Murphy on Friday nights. Murphy said that she knew some of the staff had complained, but she made no indication to Griffin that she would in fact work as scheduled on Friday nights. During the period from March 26, 1979, to November 4, 1979, a 32-week period, Griffin scheduled Murphy to work ten Friday nights. Of these ten Fridays, Mur-

phy worked three, called in sick on three, and refused to work on four. On the days which Murphy did not work, the hospital incurred certain costs in the form of overtime pay and loss of efficiency.

In late October and early November of 1979, Murphy had several conversations with Griffin and Dunn concerning her apparent refusal to work on Friday nights. At these meetings Griffin and Dunn asked Murphy whether she had any solution to the problem. Murphy's only response was that she should not be scheduled on Fridays. On one occasion Murphy's minister attended a meeting, apparently at the hospital's request, and essentially restated Murphy's position to the defendants. After it became clear that Murphy was not willing to work on Fridays, as scheduled, the hospital administration decided to terminate her. Murphy then filed a timely charge with the Equal Employment Opportunity Commission (EEOC), received a right to sue letter, and initiated this action.

## II.

█ Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a)(1), makes it unlawful for an employer to discriminate against an employee or prospective employee on the basis of that individual's "race, color, religion, sex, or national origin." Section 2000e(j) defines the term "religion" as including "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." In order to establish a prima facie case of religious discrimination a plaintiff must demonstrate: (1) that he or she had a bona fide belief that compliance with an employment requirement would be contrary to his or her religious belief or practice; (2) that he or she informed the employer about the conflict; and (3) that he or she was discharged or penalized for failing to comply with the conflicting employment requirement.

*Brenner v. Diagnostic Center Hospital,* 671 F.2d 141, 144 (5th Cir.1982) [1]; *Brown v. General Motors Corp.,* 601 F.2d 956, 959 (8th Cir.1979); *Anderson v. General Dynamics Convair Aerospace Div.,* 589 F.2d 397, 401 (9th Cir.1978), *cert. denied sub nom. International Ass'n of Machinists, etc. v. Anderson,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to show that he or she could not reasonably accommodate the employee's needs without incurring undue hardship. 42 U.S.C. § 2000e(j); *Brenner v. Diagnostic Center Hospital, supra; Anderson v. General Dynamics Convair Aerospace Div., supra.* The duty to accommodate requires that the employer take affirmative steps to explore and implement alternatives which would satisfy an employee's religious practices without (1) compromising the employment entitlements of other employees or (2) conferring a privilege on the employee the cost of which is more than *de minimis. Trans World Airlines v. Hardison, supra; Brown v. General Motors Corp., supra,* 601 F.2d at 962. *See also* 29 C.F.R. § 1605.2.

In this case, it is beyond dispute that Murphy made out a prima facie case of religious discrimination. This court finds that her religious beliefs were sincere, that she gave the defendants full notice of her religious practices, and that the sole reason for her termination was her refusal to work on her Sabbath. The only issue before the court, therefore, is whether the hospital could have reasonably accommodated Murphy's religious practices without incurring undue hardship.

The court is of the opinion that *Trans World Airlines v. Hardison, supra,* offers much guidance in resolving this issue. In that case the plaintiff Larry G. Hardison, also a follower of the Worldwide Church of God, sued Trans World Airlines (TWA) and the International Association of Machinists and Aerospace Workers, AFL–

CIO (IAM), claiming that TWA, rather than discharging him, should have relieved him of Sabbath duty in a TWA department that operated 24 hours a day throughout the year in connection with an airplane maintenance and overhaul base in Kansas City, Missouri. Shift assignments at the facility were made on the basis of a seniority system in accordance with a collective bargaining agreement. As a result of Hardison's comparatively low seniority, and the union's unwillingness to modify the system on Hardison's behalf, TWA was not able to schedule Hardison off on Friday evenings without having to pay overtime or forcing a supervisor to take Hardison's place. The Supreme Court's discussion and resolution of this problem are set out in the following passage from the opinion:

> Any employer who, like TWA, conducts an around-the-clock operation is presented with the choice of allocating work schedules either in accordance with the preferences of its employees or by involuntary assignment. Insofar as the varying shift preferences of its employees complement each other, TWA could meet its manpower need through voluntary work scheduling.
>
> \*    \*    \*    \*    \*    \*
>
> Whenever there are not enough employees who choose to work a particular shift, however, some employees must be assigned to that shift even though it is not their first choice.
>
> \*    \*    \*    \*    \*    \*
>
> It was essential to TWA's business to require Saturday and Sunday work from at least a few employees even though most employees preferred those days off. Allocating the burdens of weekend work was a matter for collective bargaining. In considering criteria to govern this allocation, TWA and the union had two alternatives: adopt a neutral system, such as seniority, a lottery, or rotating shifts; or allocate days off in accordance with the

---

1. *Brenner v. Diagnostic Center Hospital, supra,* is a decision of the new Fifth Circuit, which is accorded only persuasive authority in the Eleventh Circuit. *See Bonner v. City of Prichard,* *Alabama,* 661 F.2d 1206 (11th Cir.1981) (en banc); *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

religious needs of its employees. TWA would have had to adopt the latter in order to assure Hardison and others like him of getting the days off necessary for strict observance of their religion, but it could have done so only at the expense of others who had strong, but perhaps non-religious, reasons for not working on weekends. There were no volunteers to relieve Hardison on Saturdays, and to give Hardison Saturdays off, TWA would have had to deprive another employee of his shift preference at least in part because he did not adhere to a religion that observed the Saturday Sabbath.

Title VII does not contemplate such unequal treatment. The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities.... Indeed, the foundation of Hardison's claim is that TWA and IAM engaged in religious *discrimination* in violation of § [2000e–2(a)(1)] when they failed to arrange for him to have Saturdays off. It would be anomalous to conclude that by "reasonable accommodation" Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far.

432 U.S. at 80–81, 97 S.Ct. at 2274–75. The court in *Hardison* then concluded that "absent a discriminatory purpose," the operation of a neutral scheduling system designed to meet the needs of all employees, such as a seniority system, "cannot be an unlawful employment practice even if the system has some discriminatory consequences." 432 U.S. at 82, 97 S.Ct. at 2276. It is therefore apparent from *Hardison* that an employer in meeting his Title VII obligation as to the religious practices of his employees, is not required to alter such a neutral scheduling system, but may satisfy the reasonable accommodation requirement by demonstrating efforts to accommodate an employee within the neutral system.

■ However, in evaluating different options within the existing framework, a trial court must exclude those proposed options which would require the employer to incur more than a *de minimis* cost. In *Hardison,* the court observed:

> To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship. Like abandonment of the seniority system, to require TWA to bear additional costs when no such costs are incurred to give other employees the days off that they want would involve unequal treatment of employees on the basis of their religion. By suggesting that TWA should incur certain costs in order to give Hardison Saturdays off the Court of Appeals would in effect require TWA to finance an additional Saturday off and then to choose the employee who will enjoy it on the basis of his religious beliefs. While incurring extra costs to secure a replacement for Hardison might remove the necessity of compelling another employee to work involuntarily in Hardison's place, it would not change the fact that the privilege of having Saturdays off would be allocated according to religious beliefs.

432 U.S. at 84–85, 97 S.Ct. at 2277 (footnote omitted). As a result, this court will evaluate reasonable accommodation in light of an employer's ability to accommodate an employee within the existing framework without denying the benefits of the scheduling system to other employees or incurring a greater than *de minimis* cost. In other words, an employer, such as Edge Memorial Hospital, in satisfying its Title VII obligation as to the religious practices of its employees, is not required to make a proposed accommodation when: (1) the accommodation will deprive the benefits of the neutral scheduling system to any other employee, or (2) will require the employer to incur a greater than *de minimis* cost.

Cases which have been decided since *Hardison* have generally followed this formula. In *Brenner v. Diagnostic Center Hospital,*

671 F.2d 141 (5th Cir.1982), for example, five staff pharmacists were required to work weekends on a rotating basis. The hospital accommodated the plaintiff, an Orthodox Jew, to the extent that it allowed him to make shift swaps whenever it was his turn for Sabbath duty. The supervisor initially made the shift changes on the plaintiff's behalf, but later told the plaintiff that it was his duty to make the arrangements. In rejecting the contention that the supervisor should have directed the other pharmacists to swap shifts with the plaintiff regardless of their preferences, the new Fifth Circuit held that such action would impose a burden on the other employees "at least in part because they do not adhere to the same religion as Brenner." 671 F.2d at 147. To have hired a substitute pharmacist for the purpose of fulfilling Brenner's weekend duty, the hospital would have incurred a greater than *de minimis* cost. *Id.,* at 146.[2]

Applying the same criteria, however, the Eighth Circuit reached a different result in *Brown v. General Motors Corp.,* 601 F.2d 956 (8th Cir.1979). In that case the plaintiff sought to be scheduled off after sundown each Friday on the 4:00 p.m. to 12:30 a.m. shift in a General Motors assembly plant. The facts revealed (i) that the loss of efficiency as a result of the plaintiff's absence was a "drop in the bucket" in terms of the overall shift performance of 1200–1600 workers; (ii) that no other employee would have to double-up, or take extra duties for plaintiff as a result of his being off; and (iii) that there was a regular supply of available part-time replacement workers, known as "extra board men," who could fill-in for plaintiff on the Friday evening shift. From these facts the Court of Appeals determined that the district court

erred by ruling that no reasonable accommodation was available short of undue hardship. The court, therefore, rejected the view that General Motors could not accommodate the plaintiff without discriminating against all of its other employees. 601 F.2d at 961–62. Likewise, in *Edwards v. School Bd. of Norton,* 483 F.Supp. 620, 627 (W.D. Va.1980), the district court found that an elementary school would not incur undue hardship as a result of the absence of a teacher's aide on several annual "holy days." These cases clearly reflect the view that the trial court must evaluate reasonable accommodation and undue hardship in light of the employment context of each case. The facts in the instant case revealed that the hospital did in fact rely on a neutral scheduling system. Scheduling of LPN's was done on a rotating basis, without regard to seniority, and with some consideration given to the individual preferences of employees whenever possible. The clear policy of the hospital as to weekend work was that each member of the nursing staff was expected to work two weekends out of three. Each staff member, therefore, expected to be scheduled off one weekend out of three unless there were unusual circumstances. Following these rules in actual practice, the four-week schedule for LPN's attempted to (i) fill staff needs on any given day, (ii) rotate days so that LPN's worked different days during different weeks, (iii) allow two or more consecutive days off after working five, six, or seven consecutive days, and (iv) schedule each LPN to average between 72 and 80 hours of work each two-week period.

The scheduling records from March 26, 1979, to November 4, 1979, the period in dispute, reflected, however, that the average number of free weekends among all

---

2. To the same effect is the pre-*Hardison* case of *United States v. City of Albuquerque,* 545 F.2d 110 (10th Cir.1976), *cert. denied,* 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1092 (1977). There, three platoons of firefighters rotated shifts on a nine-day cycle. In order to accommodate the plaintiff Seventh Day Adventist's request for Saturday Sabbath off, the Fire Station would have had to deny the other firefighters the benefits of the neutral scheduling system, and

would have imposed less favorable working conditions on them. 545 F.2d at 114. To hire a substitute for that shift would have required the payment of overtime. *Id.* The Tenth Circuit, therefore, affirmed the district court's finding that the only reasonable accommodation available to the plaintiff short of undue hardship was a system of voluntary shift swaps. *Id.,* at 115.

LPN's, including Murphy, was one in four rather than one in three. As a result, the average LPN worked two and one-half to three full weekends before receiving a free weekend off. As to the reason for the average number of free weekends being below that of the weekend work rule, the evidence reflected that the hospital was at that time experiencing a shortage of full-time LPN's. The testimony revealed that the regular LPN staff was below staffing goals and there was a shortage of dependable part-time LPN's. Murphy made no showing that there was in fact a reserve of full-time or part-time LPN staff to fill-in for Murphy or other LPN's who needed to be off for legitimate reasons.

■ Reviewing the average staffing needs of the hospital in relation to the availability of full-time LPN's, this court finds that it was impossible to schedule Murphy to be off every Friday night without depriving the other LPN's of their "expected" one free weekend in three. The average staff of full-time LPN's during the relevant period was eight. After reviewing the schedules for the period the court finds that the average weekend staffing need for LPN's was five LPN's per 11–7 shift each weekend. In order to schedule each LPN to work two weekends and receive the third weekend off, the hospital would have to be able to schedule one-third of its LPN staff off every weekend. With eight LPN's on the staff, to schedule one-third off every weekend would require that three LPN's be off, and the remaining five work. Because the average weekend staffing need for LPN's during this period was five, it was possible for the hospital, on the average, to fulfill the weekend work rule when all eight LPN's actually worked two full weekends out of three.[3] But while the hospital could meet its average staffing needs and fulfill the weekend work rule if all eight of its LPN's were available for work two weekends out of three, it could not meet these goals when one out of the eight was not available for full weekend work when required. In other words, with Murphy on the staff, the hospital only had seven full-time LPN's available for work on two out of every three weekends. With an average staff need of five, the hospital could not allow one-third of the staff to be off every weekend *and* allow Murphy to be off every Friday night. Even if Murphy had been scheduled to work every Saturday night and regular holidays, as it appears she was willing to do, there would still have been a need for some LPN's to "split" their free weekends. The evidence at trial was clear that each member of the nursing staff highly valued free weekends. Splitting weekends or shifts was disfavored. In order for the hospital to (i) meet its staffing needs of five LPN's on the average per weekend, (ii) scheduling one-third of its LPN staff off every weekend, and (iii) allow plaintiff to be scheduled off every Friday night, the hospital would have needed a regular full-time LPN staff of at least nine, rather than eight.

Even with a staff of nine, however, it is clear that times could arise when the average patient census may rise to a level such that it would require a higher average staff need for a sustained period of time. In addition, there may be times when some of the nursing staff could not work as a result of illness or other unforeseeable reasons. The testimony at trial reflected the fact that staffing needs varied with the number of patients in the hospital, and that it was not easy to find replacements when an LPN could not report for work. Even though the "formula" when applied to a staff of nine LPN's and an average weekend staffing need of five would allow plaintiff to be scheduled off every Friday night, it would not account for the likely variations in staffing needs over the long run. As a result, this court is reluctant to strait-jacket an employer into such a precise formula when the employer has a comparatively

---

**3.** There would, of course, be times, due to the varying needs of the hospital, in which the actual weekend need would be more than five, and others in which it would be less. For these times, it seems clear that the hospital would maintain its policy of scheduling free weekends whenever possible, so that the average number of free weekends would be one in three.

small staff and the likelihood of varying needs. Even if Murphy worked when "the ox was in the ditch" there could still be times when the hospital could not reasonably schedule her off without encountering the problem discussed above.

This is not to say that such an employee could never be accommodated. Given an adequate number of full-time staff, the availability of dependable part-time staff, and a proportionate weekend staffing need, such an employee could be accommodated within the neutral scheduling framework without denying the benefits of system to the other employees or incurring a greater than *de minimis* cost. An employer does not incur additional costs as a result of rescheduling as long as there is an available supply of employees to be scheduled at the regular wage. *Brown v. General Motors Corp., supra,* 601 F.2d at 959. In this case, however, there were no other reasonable options available to allow Murphy off every Friday. Because the hospital's staffing needs were based on patients' medical needs, there could not be a reduction in staff without a consequent decrease in patient care. Substitute employees from within the existing staff would have required the payment of overtime, a higher wage, or decreased efficiency. Finally, the evidence was that finding additional employees, over and above the number required to meet patient needs, was almost impossible and that, in fact, the hospital was suffering from a staff shortage. It is the conclusion of this court, therefore, that as a result of the minimum average needs of the hospital and the shortage of staff, there simply were not enough regularly scheduled LPN's on the roster during the relevant period to have allowed Murphy to be scheduled off without depriving the other LPN's of the benefits of the neutral scheduling system, or requiring the hospital to incur a greater than *de minimis* cost.

An appropriate judgment will be entered in accordance with this opinion.