# ANDREWS v ALBERTSON'S, INC.

## Case No. 88-3318

State of Florida, Division of Administrative Hearings

January 19, 1988

### APPEARANCES OF COUNSEL

**Kathy R. Newman,** Legal Services of North Florida, Inc., for petitioner.

**Alison L. Gray, Richard N. Appel, Akin, Gump, Strauss, Hauer & Feld,** and **R. Bruce Gordon,** (Vice President-Legal, Southern Region), for respondent.

### OPINION OF THE COURT

ROBERT T. BENTON, II, Hearing Officer.

### *RECOMMENDED ORDER*

This matter came on for hearing in Panama City, Florida, before Robert T. Benton, II, Hearing Officer of the Division of Administrative Hearings, on November 10, 1988. The Division of Administrative Hearings received the hearing transcript on December 1, 1988, and the

parties filed post hearing submissions on December 16, 1988. The attached appendix addresses proposed findings of fact in petitioner's proposed recommended order by number.

The parties are represented by counsel.

In response to petitioner's complaint that respondent Albertson's, Inc. (Albertson's) discriminated against him on account of his religion, the Florida Commission on Human Relations (FCHR) conducted an investigation, which eventuated in a "NOTICE OF DETERMINA-TION: NO CAUSE" issued March 25, 1988. Petitioner's request for redetermination occasioned a "NOTICE OF REDETERMINATION: NO CAUSE" issued May 24, 1988.

Petitioner has filed a form petition for relief from an unlawful employment practice, pursuant to Rule 22I-9.008, Florida Administrative Code, see *Publix Supermarkets, Inc. v Florida Commission on Human Relations,* 470 So.2d 754 (Fla. 1st DCA 1985), which the FCHR transmitted to the Division of Administrative Hearings, for a *de novo* determination, in accordance with Section 120.57(1)(b)3., Florida Statutes (1987).

## ISSUE

Whether Albertson's terminated petitioner's employment on account of his religion, or failed to make reasonable accommodation for petitioner's religious observance or practice?

## FINDINGS OF FACT

1. When petitioner Roger Dale Andrews began work on October 4, 1984, at Albertson's Panama City store, one of "over 430" (T. 99) Albertson's operates, he already had 28 years' experience cutting meat. A devout Jehovah's Witness, he was an elder or lay minister, as well as "the school overseer" (T. 12) in the Bonifay, Florida congregation.

2. Some months after petitioner Andrews left a job application, Mike Jerald, who managed the Panama City store, telephoned and asked him to come for an interview. In the course of this initial interview, Mr. Andrews told Mr. Jerald that, because of his religious obligations "at certain times [he] wouldn't be able to work but . . . would be able to give [notice] . . . in . . . advance . . ." (T. 8, 58)

3. After talking it over with Eddie Powell, the meat market manager, Mr. Jerald offered petitioner a job as a meat cutter. Mr. Powell is himself a religious man, (T. 128) although not a Jehovah's Witness. Welcoming Mr. Andrews to the meat department, he remarked, prophetically, "Even if I have to work myself on a day that you have to preach, I will." (T. 11)

205

4. Mr. Powell assigned shifts to himself, to Larry Myrick, the assistant meat manager, to Joe Baker, to Randy Raybon, a divorced man from Dothan, Alabama, and to petitioner, meat cutters all, as well as to the less skilled "meat wrapper" and "deli worker." As "the only one in the store really permitted to get overtime . . . [Mr. Powell] schedule[d him]self . . . with 40, 48 hours and t[ook] what's left and normally divide[d] it up among employees." (T. 141)

5. When petitioner began, he worked 40 hours a week, but later on he was among the meat cutters who worked fewer hours some weeks. The last week he was employed at Albertson's, Mr. Powell assigned him 37.5 hours.

*Sunday Services*

6. "When a Sunday shopper asks [between six o'clock in the morning and eight or nine o'clock in the evening] for a specific cut of meat [, . . .] Albertson's management expect[s the] . . . meat market to provide it," (T. 183) and insists that a meat cutter be on hand for the purpose.

7. Meat cutters are assigned to two overlapping eight-hour shifts each day. The first begins at six o'clock in the morning and the second at noon. (T. 140) Mr. Powell did not work Sundays because "there's three days that you send orders and three days that you receive orders and none of these are on Sundays." (T. 134)

8. In October of 1984, Albertson's paid meat cutters time and a half for working Sundays and holidays, except Christmas, when the store was closed. They also earned time and a half for working more than eight hours in one day or more than forty hours a week.

9. At first, Mr. Andrews worked afternoons Fridays and Saturdays, the store's two busiest days, (T. 154( and Mondays, Tuesdays and Wednesdays. (T. 54) He also worked Thanksgiving, and five or six (T. 152) Sunday afternoons. (T. 55) Joe Baker began working at Albertson's Panama City store before petitioner did, and generally preferred working Sundays, because of the higher pay.

10. Each time Mr. Andrews worked on Sunday, it was at Mr. Baker's request. Mr. Andrews always honored these requests. (T. 55) By prior agreement with Mr. Powell, he began at one o'clock, instead of noon. Letting Mr. Andrews begin at one o'clock made it possible for him to attend church services in Bonifay, 45 minutes distant by car; and still allowed an overlap: the meat cutter on the morning shift did not leave until two o'clock. While grateful for this consideration, Mr. Andrews had never insisted on it.

206

11. Mr. Powell testified that he did not schedule petitioner for Sunday mornings partly because "he went to church . . . and I wanted to work with him as much as I could." (T. 152) But the issue never really arose, because Mr. Powell deferred to the wishes of the assistant manager, who shared Mr. Baker's fondness for the additional remuneration Sunday hours afforded, and invariable worked as the meat cutter on the Sunday morning shift. Mr. Andrews consistently expressed a willingness to work any Sunday he was not scheduled to speak. In fact, he asked for the opportunity. Mr. Powell quoted him as saying "Hey, let me work any Sundays you need me. I could use the money." (T. 157)

12. On four or five occasions, Mr. Powell let Mr. Andrews take Saturdays off. On no Saturday did Mr. Powell require another employee to work in Mr. Andrews' stead. Once "he wanted off to help build a church and there was something . . . they had at the civic center he wanted to be off to attend." (T. 154) When Mr. Andrews wanted Saturdays off, whether for secular or for religious reasons, he asked permission weeks in advance.

13. Originally, he also gave ample notice of Sunday speaking engagements, and Mr. Powell noted them in his calendar. Mr. Andrews "always let him known as soon as [he] found out that [he] had the talks," (T. 63) giving usually two to six weeks' notice, until Mr. Powell told him "ain't no sense to write them down because Joe is always working." (T. 33) Everybody involved got "lackadaisical about it." (T. 33)

14. Messrs. Powell and Andrews learned of Albertson's intention to stop paying time and a half for Sunday work, and to offer instead a premium of a dollar an hour, in February of 1986. When Mr. Andrews said, "Don't expect me to start working every Sunday," (T. 159) Mr. Powell answered, "Don't worry about it. You're not going to work every Sunday. We'll start swapping it out."

### Dies Irae

15. On the afternoon of Friday, February 28, 1986, Mr. Powell telephoned Mr. Andrews, who was off that day, to tell him he was scheduled to work on Sunday, March 2, 1986. In response, Mr. Andrews told him for the first time of his commitment to speak not only to the Jehovah's Witnesses in Bonifay at ten o'clock on the morning of March 2, but also to the congregation in Defuniak Springs at two o'clock that Sunday afternoon, for 45 minutes or an hour on each occasion.

16. Mr. Andrews had made the commitment six to nine weeks (T. 80) beforehand to speak the first Sunday in March. He was to give no ordinary "outlined" (T. 87) talk, but one in a sequence of eight lectures based on a book entitled *Creation Revolution*. The Watchtower Bible and Tract Society in Brooklyn, New York, had specified that lectures based on the chapters assigned to petitioner be given on March 2, 1986, "in the various congregations of Jehovah's Witnesses, approximately 52,000 congregations earthwide." (T. 88-89)

17. Mr. Powell had already told Mr. Raybon that he could have Sunday off to visit his children in Dothan, had already told Mr. Baker he could be off because he "said that he was going to have I believe something to do with his family," (T. 162) had already scheduled Mr. Myrick to work the Sunday morning shift, and had scheduled himself to work 46 hours the week ending March 6, 1986, on days other than Sunday. He asked Mr. Andrews to try to find a substitute.

18. This proved impossible, although Mr. Andrews telephoned W. C. "Doc" Faison, the "talk coordinator," (T. 79) in an effort to find somebody else. Telephone calls he placed to other elders went unanswered. Because preparation entailed reading several chapters of *Creation Revolution* thoroughly, no other elder had time to prepare properly, in any case. Rescheduling the services was not a feasible option, because of the number of people involved.

19. Mr. Andrews called Mr. Powell back. He told him he was unable to avoid his obligations to speak to both congregations, but offered to report to work at six o'clock on Sunday afternoon (T. 167, 182)) Mr. Powell testified that, after petitioner called him back and reported he had not found a substitute to speak at the services scheduled on Sunday,

> I asked him to keep trying. That I needed him to be at work Sunday. And he replied to me, he said, "No. I've got to do this. There's no one else that can do it." I said, "Well, do I need to take this as your resignation?" And he said, "Yes."

> Q. [By Ms. Gray] Following your conversation with Mr. Andrews on Friday, February 28, 1986, what was Mr. Andrews' employment status?

> A. He was terminated.

> Q. He was terminated or he quite?

> A. He quit.

(T. 167-8)

On a form he filled out that day, Mr. Powell wrote "voluntary quit,"

208

Respondent's Exhibit No. 10, but this was a "resignation" in name only. On February 28, 1986, respondent discharged petitioner when he refused to agree to report for work when requested on Sunday, March 1, 1986. (T. 181) Petitioner refused in order to keep conflicting commitments to participate in religious observances.

20. In general, in an emergency, Mr. Powell "would take the person that was either off that day or was off the last one that had been off, the most rested one, and that's the one [he] would pull in." (T. 144) On March 2, 1986, he worked the afternoon shift himself, earning time and a half because he also worked the hours he had scheduled for himself on the following Monday, Tuesday, Wednesday and Thursday. As meat market manager, his ordinary hourly wage exceeded the $8.91 (T. 36) petitioner was paid.

## CONCLUSIONS OF LAW

Florida law forbids any employer, defined as any corporation or other "person employing 15 or more employees for each working day in each 20 or more calendar weeks in the current or preceding calendar year," Section 760.02(6), Florida Statutes (1987) to discriminate on the basis of religion in discharging employees. Albertson's is an "employer," within the meaning of the statute.

The First Amendment "gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities." *Otten v Baltimore Ohio R. Co.,* 205 F.2d 58, 61 (2nd Cir. 1953) Compare *Estate of Thornton v Calder,* 472 U.S. 703, 86 L.Ed.2d 557, 105 S.Ct. 2914 (1985) with *Hobbie v Unemployment Appeals Com'n,* 480 U.S. —, 94 L.Ed.2d 190, 108 S. Ct. — (1987). But, under federal statutory law, it is "an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees. . . ." *Trans World Airlines, Inc. v Hardison,* 432 U.S. 63, 74, 53 L.Ed.2d 113, 125, 97 S.Ct. 2264 (1977) Ever since the decision in *School Board of Leon County v Hargis,* 400 So.2d 103 (Fla. 1st DCA 1987), federal cases decided under Title VII have been looked to in order to flesh out Florida's Human Rights Act of 1977. See *Anderson v Lykes Pasco Packing Co.,* 503 SO.2d 1269 (Fla. 2d DCA 1986).

### Prima Facie Case

The United States Supreme Court, in *Ansonia Board of Education v Philbrook,* 479 U.S. 60, 67, 93 L.Ed.2d 305, 314, 107 S.Ct. 367, 371 (1986), pretermitted the question of what constitutes a *prima facie* case of religious discrimination. Under decisions of lower federal courts, an

**209**

employee seeking redress for discharged based on religious discrimination has the burden to establish a *prima facie* case by proving that

(1) [he] had a bona fide religious belief;

(2) [he] informed h[is] employer of h[is] religious views and that they were in conflict with h[is] responsibilities as an employee; and (3) [he] was discharged because of h[is] observance of that belief. *Proctor v Consol. Freightways Corp. of Delaware,* 795 F.2d 1472, 1475 (9th Cir. 1986).

To the same effect, see *Anderson v General Dynamics Convair Aerospace Division,* 589 F.2d 397, 401 (9th Cir. 1978) *cert. den.* 442 U.S. 921, 61 L.Ed.2d 290, 99 S. Ct. 2848 (1979) and the decision in *Turpen v Missouri-Kansas-Texas R. Co.,* 736 F.2d 1022, 1026 (5th Cir. 1985).

Although respondent contends that petitioner voluntarily abandoned his job, so that no discharge ever occurred, a preponderance of the evidence showed that Mr. Powell terminated Mr. Andrews' employment when he refused to agree to report to work at noon on Sunday, March 2, 1986, because it would conflict with religious obligations he sincerely felt himself under. See *Satterwhite v Smith,* 744 F.2d 1380 (9th Cir. 1984); *Meyer v Brown Roof Construction Co.,* 661 F.2d 369 (5th Cir. 1987). Nobody has questioned the bona fides of petitioner's religious beliefs. According to uncontroverted testimony, he informed his supervisor that his religious obligations conflicted with his working the hours his employer requested.

### Reasonable Accommodation

Because petitioner met his initial burden to establish a *prima facie* case, the "burden" was thereafter upon . . . [respondent] to prove . . . [it] made good faith efforts to accommodate . . . [petitioner's] religious beliefs and, if those efforts were unsuccessful, to demonstrate that they were unable reasonably to accommodate his beliefs without undue hardship," *Anderson v General Dynamics Convair Aerospace Division,* 589 F.2d 397, 401 (9th Cir. 1978) cert. den. 442 U.S. 921, 61 L.Ed.2d 290, 99 S.Ct. 2848 (1979), although "(i)f an employer can show that no accommodation was possible without undue hardship, it makes no sense to require that he engage in a futile act." *E.E.O.C. v Townley Engineering & Mfg. Co.,* 859 F.2d 610, 615 (9th Cir. 1988).

"The term 'reasonable accommodation' is a relative term and cannot be given a hard and fast meaning." *Redmond v GAF Corp.,* 524 F.2d 897, 902 (7th Cir. 1978) But courts have, in other cases, sanctioned redress for discharge of employees whose recurring weekly religious obligations have conflicted with work requirements. *Brown v General Motors Corp.,* 601 F.2d 956 (8th Cir. 1979); *Kentucky Com'n on*

210

*Human Rights v Kerns Bakery, Inc.,* 644 S.W.2d 350 (Ky. 1982) *cert. den.* 77 L.Ed.2d. 1369, 103 S.Ct. 3115 (1983); *North Shore University Hospital v State Human Rights Appeal Board,* 82 A.D.2d 799, 439 N.Y.S.2d 408 (S.Ct. 1981). Contra *Trans World Airlines, Inc. v Hardison,* 432 U.S. 63, 97 S. Ct. 2264, 53 L.Ed.2d. 113 (1977); *United States v City of Albuquerque,* 545 F.2d 110 (10th Cir. 1976); *Murphy v Edge Memorial Hospital,* 550 F.Supp. 1185 (N.D. Ala. 1982); *New Hanover Human Relations Com'n v Pilot Freight Carriers, Inc.,* 351 S.E.2d 560 (Ct. Appt. N.C. 1987). The courts have also split where accommodation with recurring holy days was at issue. Compare *Brener v Diagnostic Center Hospital,* 671 F.2d 141 (5th. Cir. 1982) with *Edwards v School Board of City of Norton, Va.,* 483 F.Supp. 620 (W.D. Va.)

Here the record shows that Albertson's Mr. Powell had granted previous requested by Mr. Andrews to be off work both for personal and for religious reasons. Indeed, if any employee had a conflict with scheduled work hours for any reason, Mr. Powell was generally accommodating, if he "kn[e]w in time." (T. 140) Whether this case would have arisen if Mr. Andrews had requested Sunday off before Messrs. Baker and Raybon did, the record does not disclose. But, even if not, the "accommodation issue by definition arises only when a neutral rule of general applicability conflicts with the religious practices of a particular employee." *Trans World Airlines, Inc. v Hardison,* 432 U.S. 63, 87, 53 L.Ed.2d. 113, 133, 97 S. Ct. 2264 (Marshall, J., dissenting).

Because Messrs. Baker and Myrick regularly worked Sundays, Messrs. Powell and Andrews had stopped discussing the latter's Sunday plans. This breakdown in communication did not amount to a failure on petitioner's part to cooperate with his employer. Mr. Andrews bears little resemblance to the employees whose conduct precluded relief in *United States v City of Albuquerque,* 545 F.2d 110 (10th. Cir. 1976) and *Brener v Diagnostic Center Hospital,* 671 F.2d 141 (5th. Cir. 1982). As far as the record shows, Mr. Andrews had never worked on a Sunday except when Mr. Baker had approached him requesting a swap. (T. 176) The evidence showed that he was no more responsible than his employer for the desuetude into which his once consistent practice of giving the meat market manager notice of Sunday talks had fallen. If Mr. Andrews had worked on March 2, 1986, it would have been the first Sunday he had worked since November 17, 1985. Respondent's Exhibit No. 7. Petitioner did not fail "to cooperate with measures suggested by [his] employer [ ]." *Brener v Diagnostic Center Hospital,* 671 F.2d 141, 145 (1982).

Of course, the change in the remuneration scheme created a new situation for petitioner and his coworkers. As was said in *Proctor v Consolidated Freightways Corporation of Delaware,* 795 F.2d 1472 (9th Cir. 1986), with respect to an employee who took another position with the same employer, "prior efforts do not constitute compliance, in whole or in part, with the employer's obligations to take steps toward accommodation with respect to the new position." At 1477. With exceptions not pertinent here, "there can be no prospective waiver of an employee's rights under Title VII." *Alexander v Gardner-Denver Co.,* 415 U.S. 36, 51, 39 L.Ed.2d 147, 94 S.Ct. 1011, 1021 (1974)

The "burden of attempting an accommodation rests with the employer rather than the employee." *E.E.O.C. v Townley Engineering & Mfg. Co.,* 859 F.2d 610, 615 (9th Cir. 1988) In the present case, Mr. Powell asked Mr. Andrews to seek a substitute lecturer. He suggested no action on Albertson's part. (Albertson's counsel wondered why the church services could not be rescheduled.) With respect to the particular conflict between his religious obligation and his duty as an employee that brought Mr. Andrews' employment to an end, respondent failed to do "anything to accommodate And[rews'] religious beliefs." *Anderson v General Dynamics Convair Aerospace Division,* 589 F.2d 397, 401 (9th Cir. 1978) (T. 181)

Albertson's failure to attempt an accommodation constitutes a violation of the Human Rights Act of 1977, unless no accommodation was possible, without undue hardship. As it happened, Mr. Powell worked Sunday, in Mr. Andrews' absence. This accommodation, events demonstrated, was possible. The record also supports the conclusion that, if Mr. Andrews' offer to report to work after his talk in Defuniak Springs had been accepted, and if the overlap between shifts had been minimized Mr. Powell would only have had to fill in for four hours or so. Nor is it clear why schedules could not have been adjusted later in the week to avoid additional overtime costs.

Even on the assumption that accommodating petitioner on this one occasion would necessarily have entailed an additional personnel cost, such a *de minimis* one-term premium (t. 171) cannot be said to constitute an unreasonable burden. " '[U]ndue Hardship' must mean present undue hardship, as distinguished from anticipated or multiplied hardship." *Haring v Blumenthal,* 471 F.Supp. 1172, 1182 (D.D.C. 1979). Even if Albertson's had to pay a differential in wages for one man for part of one day, the record showed no need for Albertson's to do so ever again. It was the only time in some 17 months that petitioner worked for Albertson's that he is supposed to have put them to such expense.

This case differs important from *Trans World Airlines Inc. v Hardison,* 432 U.S. 63, 97 S. Ct. 2264, 53 L.Ed.2d 113 (1977), in which an employee sought half of every weekend off. Here petitioner does not seek to work any fewer Sundays than any other employee. Nothing like the demoralization proven in *Murphy v Edge Memorial Hospital,* 550 F.Supp. 1185 (N.D. Ala. 1982) or *Brener v Diagnostic Center Hospital,* 671 F.2d 141 (5th Cir. 1982) was shown to confront the employer here.

After all, only once in over 70 weeks was another employee called on to work in Mr. Andrews' stead. "[U]ntil facts or circumstances arise from which it may be concluded that there can no longer be an accommodation without undue hardship, the employee's religious practices are required to be tolerated." *Haring v Blumenthal,* 471 F. Supp. 1172, 1182 (D.D.C. 1979). Respondent has fallen far short of proving an undue hardship. The evidence established only that, for the first time in nearly a year and a half, the parties implemented their original understanding that Mr. Powell would "work [him]self on a day that [Mr. Andrews] ha[d] to preach." (T. 11)

It is, accordingly,

RECOMMENDED:

That FCHR order Albertson's to reinstate Roger D. Andrews, pay him back wages for the period from March 1, 1986, until he is reinstated, and pay reasonable attorney's fees.

DONE and ENTERED this 19th day of January, 1989, in Tallahassee, Florida.

## *APPENDIX*

Petitioner's proposed findings of fact Nos. 1, 2, and 4 through 27 have been adopted, in substance, insofar as material.

Petitioner's proposed findings of facr No. 3 has been adopted, in substance, insofar as material, except that one of the "wrappers" was know as a "deli worker."

Respondent's post hearing submission contained a helpful discussion of the evidence but did not contain numbered proposed findings of fact.