Christine L. WILSON, Plaintiff,

v.

US WEST COMMUNICATIONS, INC., Defendant.

No. CV 91–207.

United States District Court, D. Nebraska.

June 6, 1994.

Scott S. Phillips and Thomas W. Ulrich, for plaintiff.

Robert F. Rossiter, Jr., for defendant.

## MEMORANDUM OPINION AND ORDER

SHANAHAN, District Judge.

This matter came before the court for trial without a jury on February 22, 1994. The plaintiff appeared by her attorneys, Scott S. Phillips and Thomas W. Ulrich. The defendant appeared by its attorney, Robert F. Rossiter, Jr.

Both parties waived opening statements. The plaintiff introduced evidence and rested her case. At the close of plaintiff's case, the defendant moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 52(c). The court deferred ruling on the defendant's motion until the close of all the evidence. The defendant proceeded to offer evidence and rested its case. The plaintiff did not offer any rebuttal evidence. The court took under advisement the defendant's motion for judgment as a matter of law on partial findings and requested post-trial briefs.

This case involves the question whether the defendant—US WEST Communications, Inc. [US WEST], violated Title VII of the Civil Rights Act of 1964 by terminating the employment of the plaintiff—Christine L. Wilson when Wilson, as a consequence of her religious vow, refused to compromise her practice of wearing an anti-abortion button while in the work place.

*Factual Determinations.*

Pursuant to Fed.R.Civ.P. 52(a), the court makes the following findings of fact:

Christine L. Wilson was employed by US WEST from August 5, 1969 to March 28, 1991. At termination of her employment, Wilson was employed as an information specialist at US WEST's 43rd & Cuming Street facility in Omaha, Nebraska where she worked with eight other information specialists and supervisory personnel, assisting US

WEST engineers in making and keeping records regarding locations of telephone cables.

During the time relevant to this case, US WEST was in the process of "downsizing" its workforce. Downsizing made voluntary transfers difficult to obtain. As a part of the downsizing, US WEST declared employees to be "surplus" when the company closed some of its departments. As a result of downsizing, employees who were working in departments scheduled for closing were given the opportunity to move to another position for which they had expressed a preference and, if possible, would be relocated in that position. If an employee could not be relocated in a position preferred by the employee, then such employee was declared "surplus" with all others in the same general job description and was relocated within the company on the basis of seniority. In April 1989, Wilson, Patty Ryder and Rita Block, as surplus employees, were transferred to US WEST's Cuming Street facility in Omaha.

When Wilson, Ryder and Block were transferred to the Cuming Street facility, the atmosphere in that location became strained because other information specialists at the facility were angry and upset that Wilson, Ryder and Block were placed in the department when the job title, "design information specialist," had been classified as "surplus." This caused other information specialists at the facility to fear layoffs. According to Wilson, the work environment was "hostile" when she began her job at the Cuming Street facility and "never got better," although she was able to work and "get along" with her supervisors and most of the information specialists.

Throughout this time, US WEST had no dress code at the Cuming Street facility where information specialists "could wear whatever they wanted." Mary Jo Jensen was Wilson's supervisor from August 1990 until March 1991. Jensen's supervisor was Gail Klein. Together, Jensen and Klein supervised nine information specialists, including Wilson.

The nine information specialists at the Cuming Street facility worked in cubicles which had walls 48 inches high and were equipped with drawing tables and desks. A person sitting at a desk in a cubicle was unable to see another person in an adjacent or any other cubicle. To see another person in an adjacent cubicle, one would have to stand up and look over the wall into the adjacent cubicle. Files frequently used by information specialists were centrally located in the office which was equipped with a conference room, lounge, kitchen, and copy room.

Before Wilson began wearing the anti-abortion button to work, "time-robbing" by information specialists at the Cuming Street facility became a concern with management. Wilson described "time-robbing" as "walking around, talking, going back and forth from one office to the other, discussing personal things." Initially, Wilson also engaged in some "time-robbing," by carrying on personal conversations, making some personal phone calls, taking some extended breaks, and standing around talking to others on company time. In the spring of 1990, management noted that the information specialists had difficulty in maintaining a work schedule due to extended personal breaks, long lunches, and too many personal phone calls. Consequently, management attempted to end the time-robbing and resorted to supervisory exhortations at office meetings. However, time-robbing did not necessitate overtime for completion of the information specialists' work.

In late July 1990, Wilson, a Roman Catholic, made a religious vow or promise to God that she would wear a particular anti-abortion button "until there was an end to abortion or until [she] could no longer fight the fight." After making her vow, Wilson wore the button at all times unless she was sleeping or bathing. The button, measuring 2 inches in diameter, had a color photograph of a fetus depicted at the developmental stage between 18 and 20 weeks. The photograph was surrounded by a black background, and above the fetus' picture were the words "STOP ABORTION." In smaller letters and slightly above the photograph were the words "THEY'RE FORGETTING SOMEONE." Wilson chose this particular button because she wanted to be an instrument of God as she believed the Virgin Mary had

been and, therefore, Wilson believed that the Virgin Mary would choose this particular button over another, since the photograph of the fetus, in Wilson's opinion, was not "offensive or grotesque." Additionally, the button reminded Wilson of a time when her mother miscarried. As a result of that experience, Wilson was led to the conviction that "no one will ever be able to tell [her] that [a fetus] is not a baby."

Wilson believed that if she took off the button, she would compromise her vow and lose her soul. As an "uncontroverted fact" expressed in the pretrial order, the parties have stipulated: "Plaintiff's religious beliefs were sincerely held." However, the parties dispute whether Wilson's vow included her being a "living witness," that is, whether the vow required that Wilson at all times wear the anti-abortion button, with the depicted fetus prominently displayed, except when she bathed or slept or whether Wilson's vow required that she merely wear the button, irrespective of conspicuous display of the depicted fetus, until abortions ceased.

Although Wilson, in her answers to US WEST's interrogatories in November, 1991, did not mention that wearing the button was required to be a "witness," she did respond to US WEST's interrogatories as follows:

> On or about July 20, 1990, I was very burdened for those unborn children being murdered by abortion. On that date I made a sacred vow through verbal commitment to Blessed Mary and her son Jesus Christ to acknowledge the sanctity of the unborn child by wearing the pro-life button in question until the day that abortions were no longer performed. This now [sic] is sacred and is also considered a vow to God which cannot nor shall not be broken.

At trial, Wilson testified that wearing the button would allow her to be a "living witness to the truth." On cross examination, however, Wilson admitted that, in an interview given in August 1990 to a reporter for *The Catholic Voice,* she said nothing about being a "living witness." When she gave the statement to the reporter, Wilson knew "what my vow was at the time and what it meant." Although Gail Klein, one of Wilson's supervisors at US WEST, acknowledged that Wilson

was "attempting to carry" a message, Klein did not recall Wilson's ever using the word "witness" in reference to Wilson's vow which, as Klein understood, was that Wilson would "wear the button until abortions were ended." Considering the conflict in the testimony and the evidence adduced at trial, the court finds as a factual matter and concludes that Wilson's vow does not include her being a "living witness."

Pursuant to her vow, Wilson began wearing the button to work in August, 1990. Around August 18, 1990, Janice Johnson, another information specialist, approached Wilson and said, "I have a favor to ask of you." Johnson then asked Wilson not to wear the button in the class which Johnson was teaching for the information specialists. Johnson told Wilson the button was offensive. Wilson explained her religious vow, and told Johnson that wearing the button was a matter of principle and a promise to God. Wilson refused to stop wearing the button.

Wilson's wearing the button at work caused disruptions at work. Rather than doing their jobs, employees gathered and talked in the workplace. The time-robbing problem became much greater than it had been in the past. Wilson acknowledged that the time-robbing problem worsened and a "great deal of disruption occurred" after she began wearing her button to work. A union representative told Mary Jo Jensen that some employees threatened to walk off their jobs on account of the button. US WEST's witnesses included Wilson's female coworkers, some of whom are Catholic, who testified that, for "very personal reasons," they found the fetus-button "offensive" or "very disturbing and stressful," although such reactions were unrelated to any stance on abortion and were unaffected by any religious influence. For instance, some of Wilson's coworkers, when they saw the pictured fetus, experienced distress attributable to the observer's inability to have children, a miscarriage, or death of an infant shortly after the child's premature birth.

Wilson's supervisors, Mary Jo Jensen and Gail Klein, are Roman Catholics. On the issue of abortion, both Klein and Jensen support an anti-abortion position. Jensen al-

lowed Wilson to make up time after work for the time that Wilson had used over her lunch hour to attend daily mass. Wilson regularly wore a rosary and kept religious objects and pictures in her cubicle. However, her coworkers never complained to supervisors about such religious articles. Marilyn Barber, another employee of US WEST who also worked at the Cuming Street facility, wore an anti-abortion pin depicting a pair of feet of a human fetus at ten weeks of development. Barber wore that pin without objection before and after Wilson began wearing her button to work. None of Barber's coworkers told her that the pin was offensive or chastised her for wearing it. US WEST's management never asked Barber to change or cover the pin.

Wilson's supervisors met with her on five different occasions in early August 1990. During these meetings, Mary Jo Jensen and Gail Klein told Wilson about the complaints received concerning Wilson's button and an anti-abortion T-shirt which Wilson wore, also depicting a fetus. Wilson agreed not to wear the T-shirt because it was unrelated to her vow. Both Jensen and Klein told Wilson that her coworkers were uncomfortable and "upset" about the button, and that coworkers found the button to be "offensive," even to the point that some information specialists were refusing to do their work. As a result of the button's presence in the workforce, Klein noted a forty percent decline in the information specialists' productivity.

Nevertheless, Wilson told her supervisors that she should not be singled out for wearing what she wanted since the company had no dress code. Also, Wilson said that she could not understand how "a simple baby could be so offensive." Wilson explained that she "just wanted to do [her] job," and that "if people in the office didn't like the button," they should be asked not to look at the button.

US WEST, through Gail Klein and Mary Jo Jensen, offered Wilson the following options: Wilson could (1) wear the button in her cubicle, but would be required to leave the button in her cubicle when she left the cubicle and moved around the office; (2) cover the button in some manner; or (3) wear a different anti-abortion button with the same message, but without the photograph of the fetus. After visiting with Wilson's coworkers regarding the button, Jensen believed that the coworkers "could live" with the options extended to Wilson and, if Wilson had accepted one of the options, the problem regarding the button in the workplace would have been resolved.

In response to the options offered, Wilson told her supervisors that she could neither cover nor remove the button while she was at work because her removing or covering the button would break her "promise to God because the promise was to wear the button and be a living witness." Wilson suggested that management tell the information specialists to "sit at their desk[s] and do the job US WEST was paying them to do" so that Wilson's coworkers could not see the button while working in their respective cubicles. To lessen the disruption in the office, Wilson also volunteered to move to the other side of the office, miss monthly meetings of the information specialists and receive the minutes of the meetings by E–Mail. To reduce further office disruption, Wilson tried to stay in her cubicle as much as possible and took different pathways through the office to avoid contact with information specialists.

Before the dispute surrounding the button, Wilson had applied for a transfer. However, although Wilson visited with Klein about her transferring out of the group, Wilson did not apply for a transfer at anytime during the controversy concerning the button. Transfers were governed by a policy contained in the collective bargaining agreement between US WEST and the union which represented a number of US WEST employees; hence, the collective bargaining agreement specified the procedure for transfer of employees. As a result of US WEST's downsizing, transfers within the company were less prevalent. When an employee requested a transfer, the employee's immediate supervisor decided whether the employee was eligible for transfer. Thereafter, US WEST's personnel department determined whether the employee should be transferred. On one occasion near the time of the controversy over the button, an information specialist was transferred

from the group, but completion of the transfer took six months.

On August 22, 1990, Wilson met with Gail Klein, Mary Jo Jensen, and Marsha Harrell, an information specialist who was the chief steward of the Communications Workers of America Local 7400. During this meeting, Klein gave Wilson the following options: she could remove the button and place it in her cubicle or could cover the button. When Wilson wore the button to work, Klein told Wilson that she was being sent home until she could come to work in the "proper attire." In a letter to Wilson on August 27, 1990, Klein summarized Wilson's options regarding her job at US WEST: (1) wearing proper attire as discussed previously; or (2) using accrued personal and vacation time instead of reporting to work. Klein also alerted Wilson to the company's policy of treating three unexcused absences from work as job abandonment. Shortly thereafter, Wilson filed her first discrimination suit in federal court. However, in September 1990, pursuant to an agreement between US WEST and Wilson, that action was dismissed, and Wilson was permitted to return to work and wear the button pending completion of an investigation by the Nebraska Equal Opportunity Commission regarding Wilson's claim of discrimination which had been filed with the commission.

When Wilson returned to work on September 18, 1990, work disruptions resumed. Information specialists were unwilling to go into group meetings with Wilson present because they did not want to view the button. Employees continued to complain that the button made them feel uneasy. One worker refused to teach classes to other information specialists if Wilson, wearing her button, was present in class. One employee filed a grievance concerning Wilson's button, and another filed a grievance regarding required attendance at group meetings which included Wilson wearing the button. Mary Jo Jensen continued to receive complaints about the button and was accused of harassment for not settling the button issue to the satisfaction of employees. Wilson's coworkers complained to Gail Klein that their rights had not been considered regarding the button and

blamed Klein and Jensen for not resolving the issue. Information specialists also complained that Wilson flaunted her return to work and stated that their rights were not being considered by management. Jensen described the situation as "very difficult" and explained that time-robbing was not US WEST's only concern regarding the button-related disruption in the workplace. Some employees were "extremely upset . . . and somewhat volatile as far as being able to . . . stay in the workplace" and do their work. Employees threatened to walk off their jobs and were losing their tempers due to the button's presence. A counselor was brought into the Cuming Street facility to help Wilson's coworkers dispel their anger and frustration at management's inability to eliminate the conflict over the button. Despite their discomfort, Wilson's coworkers were willing to accept the accommodations offered to Wilson, namely, Wilson's leaving the button in her cubicle, covering the button when worn outside the cubicle, or Wilson's wearing a different button without the graphic depiction of a fetus.

Chris Cocchiarella, a US WEST specialist and consultant who dealt with claims of discrimination in employment, conferred with Klein and Jensen regarding the various options that had been offered to Wilson. Cocchiarella concluded that moving Wilson to a different part of the office or otherwise isolating her from other workers was inadvisable because such a situation had the "very high potential of being viewed" as a retaliatory action in response to Wilson's charge of employment discrimination. Additionally, transferring an employee who had filed a discrimination claim was against US WEST's policy of determining whether any discrimination had taken place and, if discrimination existed, taking corrective action against the perpetrator and not against the alleged victim of discrimination. Consequently, Klein and Jensen concluded that the solutions suggested by Wilson were unfeasible.

In February 1991, after its investigation, the Nebraska Equal Employment Opportunity [NEOC] determined that, although Wilson's vow was a sincerely held religious belief, no reasonable cause existed to believe

that US WEST violated Wilson's rights under the Nebraska Fair Employment Practices Act, Neb.Rev.Stat. § 48–1101 et seq., and concluded that "the evidence reflects that the employer made reasonable attempts to accommodate the Complainant's religious belief."

On March 11, 1991, US WEST requested that Wilson not report to work wearing the button, T-shirt, or anything depicting a fetus. Rather than return to work under those conditions, Wilson took a week's vacation. A final meeting with Wilson was held on March 18, 1991. In that meeting, the options available to Wilson were reviewed by H. Gary Hall, Gail Klein's successor. Wilson was given the choice of covering or replacing the button, keeping it in her cubicle, or being sent home until she complied with the accommodations offered by US WEST. When Wilson was asked to remove the button and refused, she was asked to leave the workplace. In a letter dated March 21, 1991, Hall told Wilson that if she remained absent from work without contacting Hall or Mary Jo Jensen, Wilson's absences would be considered unexcused. Wilson was again informed that three unexcused absences would constitute job abandonment. Although Wilson reported to work on Monday, March 25, she was wearing the button and, consequently, was asked to leave work. Because Wilson was absent and unexcused from work for three consecutive days, US WEST concluded that she had abandoned her job; therefore, US WEST terminated Wilson's employment on March 27, 1991.

## RELIGIOUS DISCRIMINATION

"The emphasis of both the language and the legislative history of [Title VII] is on eliminating discrimination in employment; similarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71, 97 S.Ct. 2264, 2270, 53 L.Ed.2d 113 (1977). Title VII provides:

It shall be an unlawful employment practice for an employer—

(1) to ... discharge any individual, or otherwise to discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's ... religion ...; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... religion....

42 U.S.C. § 2000e–2(a) (1988). "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j) (1988).

To establish a prima facie case of religious discrimination under Title VII, a plaintiff must prove that (1) the plaintiff has a bona fide religious belief or practice and that compliance with a requirement of employment is contrary to the plaintiff's religious belief or practice; (2) that the plaintiff informed the employer about the conflict between the employer's requirement and the plaintiff's belief or practice; and (3) that the plaintiff was discharged for refusing to comply with the employment requirement. See *Brown v. General Motors Corp.*, 601 F.2d 956, 959 (8th Cir.1979). See also, *Johnson v. Angelica Uniform Group, Inc.*, 762 F.2d 671, 673 (8th Cir.1985). To meet a prima facie case of religious discrimination, a defendant-employer must demonstrate "it has offered a reasonable accommodation" to an employee. *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 69, 107 S.Ct. 367, 372, 93 L.Ed.2d 305 (1986). An employer violates Title VII unless the employer demonstrates "an inability to reasonably accommodate ... an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." See 42 U.S.C. § 2000e(j). An accommodation is "a process of functional adjustment of conflict between individuals and groups through

change of habits and customs; ... an adjustment of differences: state of agreement: SETTLEMENT." Webster's Third New International Dictionary (Unabridged) 12 (1993).

■ An accommodation causes "undue hardship" whenever the accommodation results in " 'more than a *de minimis* cost' " to the employer. See *Ansonia Board of Education v. Philbrook,* 479 U.S. 60, 67, 107 S.Ct. 367, 370, 93 L.Ed.2d 305 (1986) (quoting *Trans World Airlines v. Hardison,* 432 U.S. 63, 84, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113 (1977)). The scope of an employer's duty to reasonably accommodate an employee's religious practices or beliefs is undefined in Title VII and is not clearly defined by case law. However,

> Differential treatment resulting from accommodation runs afoul of section 2000e–2(a)(1) ... if it: 1) compromises other employee's contractual seniority rights as secured by a collective bargaining agreement; or 2) confers a privilege, the cost of which is more than *de minimis,* solely on the basis of the recipient's religious beliefs.

*Cook v. Chrysler,* 981 F.2d 336, 338 (8th Cir.1993).

An employer's duty to reasonably accommodate an employee's religious beliefs or practices "does not require an employer to jeopardize its overall labor scheme by compromising the contractual seniority rights of other employees as secured by a collective bargaining agreement." *Mann v. Frank,* 7 F.3d 1365, 1369 (8th Cir.1993). See also, *Cook v. Chrysler,* 981 F.2d 336, 338 (8th Cir.1993), *cert. denied,* —— U.S. ——, 113 S.Ct. 2963, 125 L.Ed.2d 663 (1993). Additionally, there is

> no basis in either the statute or its legislative history for requiring an employer to choose any particular reasonable accommodation. By its very terms the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation.... Thus, where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship.

*Ansonia, supra,* 479 U.S. at 68, 107 S.Ct. at 371. As the Supreme Court noted in *Ansonia,* cooperation of both an employee and an employer is needed in finding a "reasonable accommodation" that reconciles an employee's religious practices or beliefs with the needs of an employer's business. *Id.* at 69, 107 S.Ct. at 372. See also, *Chrysler Corp. v. Mann,* 561 F.2d 1282, 1285 (8th Cir.1977), *cert. denied,* 434 U.S. 1039, 98 S.Ct. 778, 54 L.Ed.2d 788 (1978); *Redmond v. GAF Corp.,* 574 F.2d 897, 901 (7th Cir.1978).

"The term 'reasonable accommodation' is a relative term and cannot be given a hard and fast meaning. Each case involving such a determination necessarily depends upon its own facts and circumstances, and comes down to a determination of 'reasonableness' under the unique circumstances of the individual employer-employee relationship." *Redmond,* 574 F.2d at 902–03.

■ Although "reasonable accommodation" defies precise definition, and the "statute provides no guidance for determining the degree of accommodation that is required of an employer," see *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 74, 97 S.Ct. 2264, 2272, 53 L.Ed.2d 113 (1977), case law indicates that a "reasonable accommodation" is any non-discriminatory structure, procedure, policy, or method which may be implemented within the employer-employee relationship and which permits an employee to exercise his or her religious beliefs or practices without disrupting or conflicting with employment.

For example, in *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), TWA agreed to permit a union steward to seek a job-swap for Hardison whose religious beliefs prevented him from working on the sabbath, that is, from sunset Friday until sunset Saturday. *Hardison,* 432 U.S. at 67–68, 97 S.Ct. at 2268. Hardison was given his religious holidays off work whenever possible if he agreed to work traditional holidays when asked. TWA also agreed to try to find Hardison another job that would be more compatible

with his religious observance. The accommodations offered to Hardison were unavailing when he applied for a transfer to another building at TWA. At his previous location, Hardison was able to use his seniority to ensure his sabbath observance. However, because the two locations had separate seniority lists, Hardison's seniority at the new building prevented him from using his seniority to assure regular observances of the sabbath. TWA agreed to allow the union to change Hardison's work assignments, but the union was unwilling to do so because such a change would violate the seniority provisions of the collective bargaining agreement with TWA. Although a proposal to permit Hardison to work only 4 days was made to TWA, the company rejected the proposal because Hardison's job was essential, and he was the only person available on the weekend for his particular job. Leaving Hardison's position unoccupied impaired shop functions and operations that were critical to the airline. Filling Hardison's position with another person would have left other areas understaffed. Also, TWA would have had to pay premium wages to anyone who was not regularly scheduled for work on Saturdays.

In *Hardison*, the Supreme Court held that TWA made reasonable efforts to accommodate Hardison. 432 U.S. at 77, 97 S.Ct. at 2273. TWA's offer to allow the union to rearrange Hardison's shifts, adjustments for Hardison's religious holidays, and attempts to find Hardison another job constituted reasonable efforts by TWA to accommodate Hardison's religious beliefs. Additionally, the seniority system under TWA's collective bargaining agreement provided a neutral way of minimizing the times that an employee was required to work when he or she otherwise preferred to be off work. *Id.* at 78, 97 S.Ct. at 2273. By listing TWA's efforts, the Court approved TWA's attempts to accommodate Hardison within the employer-employee relationship by using job adjustments, a seniority system, and efforts to locate other work that permitted Hardison to observe his religion beliefs without disrupting or conflicting with his employment. See *Hardison*, 432 U.S. at 77–78, 97 S.Ct. at 2273.

In *Mann v. Frank,* 7 F.3d 1365 (8th Cir. 1993), the Eighth Circuit held that structures providing for voluntary overtime shifts and seniority-based job assignments were reasonable accommodations under *Hardison* for minimization of the occasions when an employee would be required to work on days he or she preferred to have off. *Mann,* 7 F.3d at 1369. Mann, a postal employee, voluntarily placed herself on a list to work overtime. *Mann,* 7 F.3d at 1367. A dispute arose when Mann was called to work overtime on the sabbath, and no other qualified employee was available to replace Mann in voluntary overtime. *Id.* at 1368. Requiring work by the one qualified employee who could have worked for Mann, but who had not volunteered for overtime, would have led to a grievance due to a violation of the collective bargaining agreement. Consequently, Mann was ordered to work overtime. Rather than work on the sabbath, Mann failed to appear for work and gave car trouble as the reason for her absence. Because Mann was unable to substantiate her claim of car trouble, the postal service concluded that she was absent without leave and suspended her from work for 7 days without pay. The Eighth Circuit held that reasonable accommodations for Mann's religious beliefs had been satisfied through the neutral means of voluntary overtime and the collective bargaining agreement's seniority system. *Id.* at 1369.

"If the employer's efforts fail to eliminate the employee's religious conflict, the burden remains on the employer to establish that it is unable to reasonably accommodate the employee's religious beliefs without incurring undue hardship." *Smith v. Pyro Mining Co.,* 827 F.2d 1081, 1085 (6th Cir.1987), *cert. denied,* 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988).

> [A]n employer does not sustain his burden of proof merely by showing that an accommodation would be bothersome to administer or disruptive of the operating routine.... The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted.

*Smith v. Pyro Mining Co.,* 827 F.2d at 1086 (quoting *Draper v. United States Pipe &*

*Foundry Co.,* 527 F.2d 515, 520 (6th Cir. 1975)). An "employer has met its obligation under [42 U.S.C. 2000e(j)] when it demonstrates that it has offered a reasonable accommodation to the employee." *Id.* at 1086. However, "[a]n employer may nonetheless establish undue hardship without actually putting an accommodation into effect." *Id.* Additionally, "[a]n employer must still, ... present evidence of undue hardship; it cannot rely merely on speculation." *Id.*

■ As noted by the Supreme Court in *Hardison,* an accommodation causes an undue hardship whenever the accommodation causes "more than a *de minimis*" cost to the employer. *Trans World Airlines v. Hardison,* 432 U.S. 63, 84, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113 (1977). See also, *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 67, 107 S.Ct. 367, 370, 93 L.Ed.2d 305 (1986). An accommodation which requires an employer's violation of a collective bargaining agreement constitutes an undue hardship. See *Hardison,* 432 U.S. at 83, 97 S.Ct. at 2276.

*Conclusions of Law.*

In light of the foregoing, the court reaches the following conclusions of law:

This court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e et seq. and 28 U.S.C. § 1332 (federal question). U.S. West Communications is an employer for purposes of 42 U.S.C. § 2000e(b) (1988).

■ Wilson informed US WEST about her vow. Her practice of wearing the particular button which is the subject of this dispute is a practice included within the statutory definition of "religion" pursuant to 42 U.S.C. § 2000e(j). Since Wilson's religious vow required her to wear the button, although not prominently displayed on her person, at all times except when she bathed or slept, US WEST's requirement that Wilson dress in what the company considered appropriate attire for the workplace, that is, without the button, was contrary to Wilson's religious belief or practice. Because Wilson refused to comply with US WEST's requirement and was not permitted to work while wearing the button, her absence from work on three consecutive days during March of 1991 was unexcused and the basis for her termination of employment due to job abandonment. Consequently, the court concludes that Wilson has proven a prima facie case of religious discrimination under Title VII. See 42 U.S.C. 2000e–2(a); *Johnson v. Angelica Uniform Group, Inc.,* 762 F.2d 671, 673 (8th Cir.1985); *Brown v. General Motors Corp.,* 601 F.2d 956, 959 (8th Cir.1979).

■ Since Wilson has proven a prima facie case of religious discrimination, US WEST's motion for judgment as a matter of law, essentially a motion for judgment on partial findings, is denied. See Fed.R.Civ.P. 52(c). Consequently, to avoid liability under Title VII, US WEST must demonstrate that it was "unable to reasonably accommodate" Wilson's "religious observance or practice without undue hardship on the conduct" of US WEST's business. See 42 U.S.C. § 2000e(j).

US WEST offered the following accommodations to Wilson: (1) replace the button with another button without the photograph of a fetus; (2) wear the button while in her cubicle, but leave the button in her cubicle when she circulated within the office; or (3) wear the button, but in some manner cover the button or cover the picture of the fetus.

As previously mentioned, this court has found, as a factual determination, that Wilson's vow did not require her to be a "living witness." With that consideration in mind, the court will proceed to analyze the offers of accommodation which US WEST extended to Wilson.

The court concludes that US WEST's proffered accommodation, that is, Wilson's leaving the button in her cubicle while she circulated in the office, is not an accommodation of Wilson's sincerely held religious belief. Wilson's vow required her to wear the button except when she slept or bathed. While she was at work, Wilson's removal of the button would constitute a violation of her vow. Consequently, the court concludes that US WEST's offer that Wilson remove the button while she circulated in the office was not a reasonable accommodation of Wilson's religious belief.

The court further concludes that US WEST's offered accommodation in Wilson's

replacing the button with another button is not a reasonable accommodation. Wilson told Gail Klein that her vow was made in reference to the particular button which she was wearing. Replacing the fetus-button with a different button without the picture of the fetus would not have permitted Wilson to wear the button encompassed by her vow. Because US WEST's offer regarding a substitute button does not allow Wilson to exercise her sincerely held religious beliefs or practices at work, US WEST's offer is not a reasonable accommodation.

However, the court finds that US WEST's offer that Wilson in some manner cover the button in the workplace is a reasonable accommodation. Wilson's covering the button would have allowed her to continue wearing the button while she was at work. Because her vow required her to wear the button, although not prominently displaying the depicted fetus at all times, Wilson could have continued to wear the button covered in some way which would have allowed Wilson to wear the button in the workplace and would have avoided the turmoil involving her co-workers. Therefore, the court concludes that US WEST's offered accommodation that Wilson in some way cover the button was reasonable.

**UNDUE HARDSHIP**

■ Although the court notes that once an employer demonstrates that the employer "has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end," the court, nonetheless, considers whether US WEST was unable to accommodate Wilson's religious beliefs or practices without an undue burden or hardship on US WEST. See *Ansonia*, 479 U.S. 60, 68, 107 S.Ct. 367, 371, 93 L.Ed.2d 305 (1986). The court also notes that an employer need not further show that "each of the employee's alternative accommodations would result in undue hardship." *Id.*

Assuming that Wilson's vow did require her to be a "living witness," it is evident that none of US WEST's offered accommodations, including covering the button, would have permitted Wilson to exercise her sincerely held religious beliefs or practices, and, there-

fore, none of the accommodations offered by US WEST would have reasonably accommodated Wilson in her religious beliefs.

An employer violates Title VII unless the employer demonstrates that it is "unable to reasonably accommodate ... an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). An accommodation causes "undue hardship" whenever it results in " 'more than a *de minimis* cost' " to the employer. See *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 67, 107 S.Ct. 367, 370, 93 L.Ed.2d 305 (1986) (quoting *Trans World Airlines v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113 (1977)).

■ Wilson's coworkers were disturbed, distressed, and offended by the button which Wilson wore. A labor grievance was filed on account of the button. Wilson's coworkers balked at attending company meetings which involved Wilson wearing the button and became angry and frustrated by management's inability to resolve the issue. At various times, Wilson's coworkers threatened to walk off their jobs. A company counselor had to confer with Wilson's coworkers concerning the unpleasant work environment attributable to the presence of the button in the workplace. Loss of efficiency and productivity as well as the expenditure of time and energy in attempts to alleviate the acrimonious atmosphere at the Cuming Street facility presented more than a *de minimis* cost to US WEST.

Although Wilson suggested that Klein simply instruct the other information specialists to disregard the button, Klein was unable to persuade Wilson's coworkers to ignore the presence of the button. Wilson's additional suggestion that she be allowed to move to the other side of the office and, in effect, isolate herself presented a potential legal problem for US WEST. US WEST feared that Wilson, who had already filed a discrimination complaint with the Nebraska Equal Opportunity Commission, would further charge that isolation of Wilson in the workplace was a form of retaliation for her filing the discrimination complaint. Exposing an employer to

legal liability is considered an undue hardship. See *Bhatia v. Chevron U.S.A., Inc.,* 734 F.2d 1382, 1384 (9th Cir.1984). Under the work conditions and the type of work done by information specialists, no practical avenue was open to US WEST for Wilson's avoiding contact with her coworkers.

Transferring Wilson was infeasible because transfers were governed by a specific policy prescribed in the collective bargaining agreement between US WEST and the union. As a result of downsizing at US WEST, transfers were less prevalent. Although Wilson had requested a transfer before she wore the button to work, she made no request for a transfer during the controversy over the button. Nevertheless, US WEST's circumvention of procedures set in place by the collective bargaining agreement would have compromised the rights of Wilson's coworkers under the agreement and undoubtedly would have led to union grievances. Waiting a protracted period until Wilson's transfer became possible would have merely prolonged the loss of productivity and stress among Wilson's coworkers. Consequently, the possibility of Wilson's transfer would not have eliminated US WEST's costs related to the display of the button in the workplace and, thus, would not have been achieved without an undue hardship on the company.

In summary, the court concludes that US WEST's motion for judgment as a matter of law, which is essentially a motion for judgment on partial findings, should be and is denied. See Fed.R.Civ.P. 52(c). The court further concludes that US WEST reasonably accommodated Wilson's sincerely held religious beliefs or practices by offering Wilson the opportunity to wear the button in the workplace if the picture of the fetus was covered in some manner. The court further concludes that even if Wilson's vow included her being a "living witness," none of her suggested accommodations could have been implemented without imposing more than a *de minimis* cost to US WEST. Consequently, Wilson's suggested accommodations could not have been implemented without an undue hardship to US WEST. For that reason, the court finds and concludes that US WEST, by demonstrating undue hardship in accommo-

dating Wilson's religious beliefs, has met Wilson's prima facie case of religious discrimination. Therefore, US WEST is not liable on Wilson's charge of religious discrimination contrary to Title VII.

In view of the court's findings of fact and conclusions of law, judgment should be and will be granted to the defendant—US WEST and against the plaintiff—Christine L. Wilson. Pursuant to Fed.R.Civ.P. 58, a separate "JUDGMENT," consistent with this "MEMORANDUM OPINION and ORDER," is being entered and filed on this 6th day of June, 1994.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED:

1. That the defendant, US WEST COMMUNICATIONS, INC., shall have judgment against the plaintiff, Christine L. Wilson;

2. That the action and complaint of the plaintiff, Christine L. Wilson, shall be dismissed; and

3. That each party shall pay their own costs.